**In re Alberta C. JACKSON and Oscar Lee Jackson, Debtors.**

**Alberta C. JACKSON and Oscar Lee Jackson, Plaintiffs,**

**v.**

**SECURITY FINANCE GROUP, Defendant.**

**Bankruptcy No. 83–00634.
Adv. No. 84–0029.**

United States Bankruptcy Court, District of Columbia.

June 18, 1984.

Gloria W. Liddell, Washington, D.C., for plaintiffs.

Steven H. Hofberg, Rockville, Md., Mark A. Winkler, Washington, D.C., for defendant.

## OPINION

GEORGE F. BASON, Jr., Bankruptcy Judge.

The issue before the Court is whether and on what terms to continue a preliminary injunction against foreclosure of the debtors' real property located at 5015 and 5033 13th Place, N.E., Washington, D.C. On January 17, 1983 the debtors obtained a loan from defendant Security Finance Group, Inc. ("SFG") in the face amount of $65,000, payable in twelve consecutive monthly installments of $975.00, representing interest only, with the entire principal amount due in a balloon payment on January 17, 1984.

It appears that by April 17, 1983 the debtors were already in default on their monthly interest-only payments. SFG scheduled a foreclosure for July 5, 1983, which was cancelled when the debtor Alberta Jackson filed a prior Chapter 13 petition (Case No. 83–00405, later dismissed). The instant Chapter 13 case was filed on November 14, 1983. This Court granted SFG's request for relief from the automatic stay (11 U.S.C. § 362) by Order dated December 22, 1983; and SFG again scheduled a foreclosure, to be held on March 5, 1984. However, this Court granted a preliminary injunction following a hearing held on February 23, 1984, conditioned on payment to SFG of $400 by February 29 and $975 by March 9, 1984. Those sums were paid. At a further hearing on March 28, 1984 the court took under advisement the question of whether to continue or dissolve the preliminary injunction, and by oral ruling from

the bench continued the injunction while the matter remained under advisement, conditioned on the debtors' paying an additional $975 to SFG by April 10, 1984. That sum too was paid. By order dated April 10, 1984 and entered in the *Jackson* case (No. 83–00634) as distinguished from this adversary proceeding (No. 84–0029), and in conjunction with an order denying confirmation of the debtors' then-proposed plan, this Court ordered the debtors to continue paying SFG at the rate of $975 per month until further order. Pursuant to that order, the debtors paid another $975 on May 14, 1984.

For the reasons set forth below, the Court has decided to continue the preliminary injunction until the earliest of confirmation of the debtors' debt-adjustment plan or any amended plan, dismissal of their Chapter 13 case, or termination of this adversary proceeding. The continuation of the preliminary injunction will not be conditioned on the debtors' paying any further periodic amounts to SFG in addition to those paid to date.

■ The legal standard which this Court must apply at this time, in deciding whether to continue the preliminary injunction in this adversary proceeding, is the four-prong test set forth in *Virginia Petroleum Jobbers Ass'n v. F.P.C.*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), as elaborated upon in *W.M.A.T.C. v. Holiday Tours, Inc.*, 182 U.S.App.D.C. 220, 559 F.2d 841 (1977). Applying that test, the Court finds:

(i) The debtor/plaintiffs have made a strong showing of irreparable injury, in that their and their family's homes will be foreclosed if the injunction is not continued;

(ii) In view of this Court's tentative ruling crediting against principal the loan origination and loan broker's fees and all loan payments made to date, SFG has failed to show it will be seriously or irreparably injured by continuation of the injunction *pendente lite*, in that SFG is adequately protected by a considerable equity cushion;

(iii) As discussed below, the debtors will almost certainly prevail on at least one count of their amended complaint; and

(iv) Thus far in this adversary proceeding it does not appear to the Court that any public interest issue is substantially involved.

At the hearing before this Court on March 28, 1974 the debtors attacked the SFG loan on a number of grounds (some of which they had also pressed at the February 23 hearing and indeed at the lift-stay hearing held in December 1983). They claimed duress, fraud, misrepresentation, overreaching and unconscionability, usury under D.C.Code § 28–3301 *et seq.*, and violation of the federal Truth-in-Lending Act (15 U.S.C. § 1601 *et seq.*). This Court is not prepared at this preliminary stage of this proceeding to rule that the debtors have met their burden of proof as to any of their grounds for relief except the claim under D.C.Code § 28–3301.

■ *As to duress:* It is true that, at the time they got the SFG loan, the debtors' were in desperate financial straits. Foreclosure on the property at 5033 13th Place, N.E. (occupied by the debtors' parents and one of their sons) was to take place that day, and foreclosure on 5015 13th Place, N.E. (occupied by the debtors themselves and a number of their children) was also imminent. It is arguable whether SFG took advantage of the debtors' desperate plight in order to drive an extremely hard bargain; or whether SFG came to the debtors' rescue to save their and their families' houses from foreclosure, when no one else would; or perhaps both. What is not arguable is that SFG was not one of the parties foreclosing at that time. Thus, any duress is not attributable to SFG, and under the law as it now exists SFG is not answerable for any such duress. *Fruhauf Southwest Garment Co. v. United States*, 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62 (1953): "The assertion of duress must be proven to have been the result of defendant's conduct and not by the plaintiff's necessities."

*As to fraud and misrepresentation:* There appears little doubt that SFG failed to disclose the true annual percentage rate on its loan. But neither does there seem much doubt that SFG did disclose (or at least the debtors were well aware of the fact) that there would be charges in addition to the stated 18% interest. Thus, the dollar amount of SFG's loan origination fee was disclosed on the settlement statement which the debtors signed. The debtors were concededly aware there would be a loan broker's fee, although that amount is inaccurately described in the settlement statement as "Cash to borrower", and the debtors claim there was no prior disclosure of the amount of that fee. The debtors contend they would not have borrowed from SFG at all had they known that the true annual percentage rate was (as they assert) approximately 37%, taking into account these two fees, instead of the stated 18%. However, the Court gives little credence to this contention, in view of the debtors' desperate plight and the unavailability of other means then known to them to prevent foreclosure. Hence, the Court concludes that the debtors have not, at this juncture, offered sufficient proof of actionable fraud or misrepresentation to justify continuance of the preliminary injunction.

The Court reaches the same conclusion concerning the debtors' claims of *unconscionability and overreaching.* While SFG struck a hard bargain, SFG also took a high risk. The D.C. City Council has recently expressed public policy for this jurisdiction by enacting legislation setting a ceiling of 24% true annual percentage rate on loans secured by owner-occupied dwellings, even for business-purpose loans, precisely in order to deal with abuses in this jurisdiction by "unscrupulous lenders" that make high-interest, short-term, balloon-payment loans on borrowers' residences. D.C.Law No. 5–62. But that legislation did not become effective until more than a year after SFG's loan was made; and the difference between the 24% ceiling and the 37% rate involved here is not so great as to persuade this Court at this juncture that the common-law doctrine of unconscionability should apply. *But see Greene v. Gibraltar Mortgage Investment Corp.,* 488 F.Supp. 177 (D.D.C.1980); *Lyon v. Smith,* 2 App.D.C. 37 (1893).

Finally we come to the debtors' two statutory claims. The debtors' claims under the D.C. usury statute and under the federal Truth-in-Lending Act are of course closely similar. In both cases the critical question appears to be whether the loan was for a business purpose. But, based on a close reading of the precise language of the two statutes, this Court concludes that at least at this stage it appears the debtor/plaintiffs are not likely to prevail under the federal statute but they are almost certain to prevail under the local usury statute. The reasons for reaching opposite conclusions as to the two statutes are set forth below.

The debtors' financial difficulties apparently arose because of the failure of two restaurant business ventures that they had conducted during 1974–1982. Despite some testimony by the debtors to the contrary, the Court finds, for purposes of this proceeding, that both of the loans which were about to be foreclosed in January 1983 and which were paid off and replaced by the SFG loan were business-purpose loans. Thus, the purposes of the loan from SFG were (a) to pay off prior business-purpose loans made by others and (b) to stave off foreclosure.

The federal law by its terms applies only to credit transactions "primarily for personal, family or household purposes." 15 U.S.C. § 1602(h). In addition to this limitation on its reach, the federal law also contains an explicit exemption for "Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes." 15 U.S.C. § 1603(1).

When business-purpose loans are refinanced through a new loan by a new lender, is the new loan *ipso facto* "for a business purpose"? Or do the facts that the debtors' businesses are no longer in existence and that the debtors' predominant and overriding reason for paying off the prior

loans is to stave off foreclosure make the new loan one "primarily for personal, family or household purposes"? Neither party has cited compelling authority on this precise issue, and the Court has found none.

The two most pertinent cases cited by the parties are *Anderson v. Lester,* 382 So.2d 1019, 1023 (La.App.1980), and *Toy National Bank v. McGarr,* 286 N.W.2d 376 (Iowa 1979).

In *Anderson,* the court held that the debtors' new loan was for personal purposes because the debtors' "purpose ... was to prevent a seizure of their home" and the loan proceeds "were applied to selected debts which represented the most immediate threats to the security of their home." (However, elsewhere in its opinion the court noted that the debtors contended that most of the funds borrowed went toward paying non-business debts (382 So.2d at 1022), and it is possible that the court gave some weight to this factor.)

On the other hand, in *Toy National Bank, supra,* 286 N.W.2d at 378, the court refused to hold that a refinancing by the original lender of a $12,000 prior business loan and a $1,000 prior personal loan became a consumer loan transaction because it staved off foreclosure on the debtors' home. Rather, the *Toy* court held (286 N.W.2d at 378): "The only workable approach is to characterize a loan transaction by the use to which the proceeds are originally placed and maintain the same characterization throughout the life of the loan." That case of course involved a refinancing by the same lender in which the court could regard the new note as part of the same "loan transaction" as the original notes, whereas here there is a new loan by a new lender paying off the old loans made by the two prior lenders.

Another pertinent recent case is *Anderson v. Foothill Industrial Bank,* 674 P.2d 232 (Wyo.1984). There, the court upheld a jury finding of business purpose even though slightly more than half the loan proceeds went to pay off a previous second mortgage on the debtor's house. The court reasoned that the debtor's primary motive in obtaining the new loan was to obtain financing on a truck and trailer and for start-up expenses to enter a mail-route business. The previous personal-residence loan was paid off simply as a means to the end of obtaining the new business-purpose loan on favorable terms. Thus, the court held in effect that determining the "purpose" of a loan requires more than simply computing what the majority of the loan's proceeds were used for. Rather, the debtors' primary motive must be examined. This line of reasoning would seem to lead in this case to the conclusion that, since the debtors' primary motive was to prevent foreclosures on the debtors' and their family's residences, and since the debtors' businesses were then defunct, the SFG loan was for personal and family purposes and not for a business purpose, and therefore the federal statute does apply.

Many of the cases cited by the parties follow the above-stated rule of looking to debtors' motives in order to determine the "purpose" of the loan, within the meaning of the federal truth-in-lending statute. *Tower v. Moss,* 625 F.2d 1161, 1166 (5th Cir.1980) (mortgage on home, which is now occupied by custodial lessee paying nominal rent but in which borrower formerly lived and "fully expects to reside" upon retirement, is consumer transaction); *Gallegos v. Stokes,* 593 F.2d 372, 375 (10th Cir.1979) (truck which was debtor's sole means of transportation was primarily for personal use, although she also intended to use it to sell fresh produce); *Gerasta v. Hibernia National Bank,* 411 F.Supp. 176, 185 (E.D. La.1975), *modified,* 575 F.2d 580 (5th Cir. 1978) (second mortgage on future residence is consumer transaction); *Sapenter v. Dreyco, Inc.,* 326 F.Supp. 871 (E.D.La.), *aff'd.,* 450 F.2d 941 (5th Cir.1971), *cert. den.,* 406 U.S. 920, 92 S.Ct. 1775, 32 L.Ed.2d 120 (1972) (mortgage placed on debtor's own residence in order to avoid foreclosure on rental property they owned was not consumer transaction but was to extend a past due obligation on investment property and hence was commercial).

Fortunately, this Court need not at this juncture of this proceeding decide the question whether the federal statute applies to SFG's loan. For it is a relatively much less difficult task to decide that SFG's loan does violate the local D.C. usury statute, thus entitling the debtors to the continuing preliminary injunction that they seek.

■ The D.C. usury statute is worded differently than the federal truth-in-lending statute. It is not restricted in scope, as is the federal statute, to apply only to loans made "primarily for personal, family or household purposes." Rather it applies to *all* loans that are not excluded. Moreover, the business-purpose exceptions of the D.C. statute are more narrowly drawn than those of the federal statute. The exceptions apply only if "the loan is made for the purpose of *acquiring* or *carrying on* a business, professional, or commercial activity" or "for the purpose of *acquiring* any real or personal *property as an investment* or for *carrying on an investment activity.*" D.C.Code, § 28–3301(d)(2) and (3); emphasis added. It is undisputed in this case that in January 1983, when SFG made its loan, the debtors were no longer "carrying on" any business or commercial activity, nor did they intend to use any of the loan proceeds in order to "acquire" any business; and SFG knew these facts. SFG knew that the proceeds went entirely to pay off prior debts. And, as SFG knew, neither of the properties were then investment properties, but rather they were the debtors' and their family's residences.

SFG argues that the investment-activity exception applies as to the property at 5033 13th Place, N.E., because at a later date the debtors, in an effort to present a feasible debt-adjustment plan, entered into formal lease agreements for payment of rent to them by their kin living in that property. However, the uncontroverted testimony was that no such formal lease or rental-payment agreement existed in January 1983, when SFG made its loan, and in fact no regular monthly amounts were paid to the debtors by their kin for occupancy of those premises at that time, or until later,

if at all. This Court finds as a fact that, as to the property at 5033 13th Place, N.E., the debtors' purpose in obtaining the SFG loan in January 1983 was to provide continued living accommodations for their kin. They wanted to keep that property for that purpose, not in order to derive income from or appreciation in value of that property. Hence the debtors' purpose as to that property was not related to "carrying on" any "investment activity" or to "acquiring" any "investment property." In addition, the representation made by the debtors on their loan application was that the purpose of the loan was "To pay off existing business loans on properties"; their handwritten representation on the business-purpose affidavit they signed was that the purpose of the loan was "To refinance existing business loans"; the typewritten text of that affidavit (which was no doubt prepared by SFG or its agent rather than by the debtors) refers solely to the business-purpose exception and not to the investment-activity exception in the D.C. statute; and the printed form of representation on the promissory note they signed (which also was no doubt prepared by or on behalf of SFG and not by the debtors) was that "the loan proceeds will be used solely for business or commercial (excluding agricultural) purposes"—again containing no reference to the investment-activity exception. The conclusion is inescapable that SFG did not in fact in January 1983 rely upon or have any basis for relying upon the investment-activity exception to the usury law.

■ SFG has raised the defenses of *res judicata* and collateral estoppel (and this Court will treat these defenses as also including the "law of the case" doctrine), based on the December 22, 1983 Order of this Court lifting the automatic stay so as to permit foreclosure, and the fact that the debtors sought at that time to raise usury as a defense in the lift-stay proceedings. However, matters appropriate for consideration in proceedings for relief from the stay are limited. *In re Coleman*, 21 B.R. 832, 836, 9 B.C.D. 364 (Bkcy.S.D.Tex.1982):

"An action to avoid a fraudulent transfer is simply not a proper issue in a § 362 complaint [for relief from the automatic stay]. For these reasons this court is not willing to consider *res judicata* as a defense to the present suit [to avoid a foreclosure sale as a fraudulent or preferential transfer]."

To the same effect are *Vastola v. Milks*, 14 B.R. 15 (D.C.W.D.N.Y.1981) and *In re Williams*, 18 B.R. 102 (Bkcy.D.Vt.1982). The legislative history makes the matter unequivocally clear. S.Rep. 95–989 (1978), p. 55, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5841:

"... at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in cases such as *In re Essex Properties, Ltd.*, 430 F.Supp. 1112 (N.D.Cal.1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing."

H.Rep. 95–595 (1977), p. 344, is to the same effect.

In addition, nowhere in this Court's findings, conclusions and order of December 22, 1983 lifting the stay is there even any mention of the plaintiffs' present claims against SFG, including the usury claim, much less any disposition of any of those claims. Hence, one of the essentials for collateral estoppel or law of the case to apply is missing, in that the matter now at issue has not been actually decided in the prior ruling. *Stebbins v. Keystone Insurance Co.*, 156 U.S.App.D.C. 326, 481 F.2d 501 (1973).

■■■ SFG has also raised the defense that the debtors are "estopped to benefit from their own misrepresentations," referring to the debtors' business-purpose representations, including their partially handwritten affidavit. This Court is singularly unimpressed by that argument. For such an estoppel to apply, there must be a misrepresentation of fact, intended to be relied upon and to mislead and in fact relied upon and misleading the other party to that party's detriment. *In re Washington Medical Center Inc.*, 10 B.R. 616 (Bkcy.D.C.1981). In this case none of those elements is present.

The debtors made no misrepresentation of fact. They fully and clearly revealed that the purpose of the loan was "to refinance" (or "to pay off") prior business-purpose loans. The testimony of its own witnesses establishes that SFG knew full well that the debtors were no longer in business and hence could not "carry on" any business, and that the debtors did not intend to use the loan proceeds in order to "acquire" any business.* Instead, as the debtors clearly and succinctly revealed in writing,

---

* One of SFG's witnesses testified that the debtors told him they were planning to go back in the restaurant business and had all the necessary equipment. However, this witness did not testify that they told the witness they planned to use any of the loan proceeds for that purpose; and it is obvious the witness could not have truthfully so testified, since all the net proceeds went to pay off liens on the debtors' and their family's homes. Nor is there any evidence that SFG either relied on this statement in any way or made any independent investigation at all concerning it.

they intended to use the proceeds of the SFG loan to pay off loans generated by their prior but then defunct businesses. What is involved here appears to be a mutual mistake of law rather than a misrepresentation of fact. Since SFG is in the business of making loans and the debtors are not, there is no unfairness at all in imposing upon SFG rather than the debtors the burden of determining whether upon a particular set of facts a proposed loan is or is not exempt from the D.C. usury law.

Second, as noted above, SFG was not misled as to the facts. It knew the facts. Nor is there any evidence at all that the debtors intended or attempted to mislead SFG. Quite the contrary, they revealed all.

Nor is there any evidence of either reliance or detriment. As SFG's witness testified, SFG made its own independent investigation and verified the information supplied by the debtors before it made its loan. Any detriment suffered by SFG is the result not of anything the debtors did or said but of SFG's own independent conclusion, based upon the undisputed facts, as to the scope of the business-purpose exception to the D.C. usury law.

Finally, even if the debtors had intentionally misrepresented the facts and SFG had detrimentally relied thereon, this Court would still rule against SFG on this issue, unless SFG also proved that it had conducted a reasonable and thorough investigation of its own. *In re Washington Med. Center, Inc., supra.* This Court believes that the lender's burden of proof on this issue should be especially heavy in view of the following excerpt from the legislative history of the D.C. City Council's recently-enacted law (No. 5–62) which *inter alia* prohibits lenders from requiring borrowers to sign a false business-purpose affidavit or statement, and provides criminal penalties if lenders do so:

> Bill 4–290, "Mortgage Interest Rate Ceiling Amendment Act of 1982", was designed to guard against the practice of some lenders of getting around the District's current 15% interest rate ceiling on second trusts secured by residential real property by requiring borrowers to sign an affidavit stating that the loan was for a business purpose. At the September 11, 1981 public hearing on Bill 4–290, it became clear that this practice was being engaged in by a minority of unscrupulous lenders....
>
> Since second trust loans were not readily available, persons needing such loans, either to finance the purchase of a home or to take advantage of the equity they have built up in their homes, are faced with two hard choices: (1) do without the money they need; or (2) sign whatever is necessary in order to obtain the loan they need. Unfortunately, the first option is not realistic for many people and so the second choice is their only choice. Thus, the only persons benefiting under the District's current interest rate ceiling are unscrupulous lenders. Both borrowers and honest lenders are being hurt.

(Report of Committee on Finance and Revenue on Bill 5–193, Oct. 20, 1983, p. 2.) *See also Greene v. Gibraltar Mortgage Investment Corp.*, 488 F.Supp. 177 (D.D.C. 1980).

Since the usury law was passed for the protection of borrowers, a lender should not be permitted to evade that law by requiring borrowers to sign affidavits as a condition for obtaining any loan, then failing to conduct a reasonable and thorough investigation of its own concerning the truthfulness of the matters asserted in the affidavits, and then claiming detrimental reliance. The balance of wrongdoing tilts heavily against the lender in such a case. *See Rubin v. Douglas*, 59 A.2d 690, 691 (D.C.Mun.App.1948):

> "... we do not consider plaintiff in *pari delicto* with defendant, but even if she were it is apparent that the law was passed for the protection of the public including plaintiff, and that the purposes of the Act will not be effectuated by permitting defendant to retain that which he ought not to have received."

SFG also raises the defense of "unclean hands," based on the same alleged factual misrepresentations by the debtors. As not-

ed above, there were no factual misrepresentations; even if there had been, this Court would hold that, at least in the absence of a thorough investigation, the hands of a lender that presented borrowers with a Hobson's choice of either signing a false affidavit or losing their home through foreclosure are considerably less clean than those of the borrower; and, to the extent there was a mutual legal mistake concerning the scope of the D.C. usury law, the risk of any resulting loss should fall upon SFG rather than the debtors.

■ Finally, SFG raises the defense of limitations of actions. The debtors filed their instant Chapter 13 petition on November 14, 1983, less than a year after SFG's loan was made (which was on January 17, 1983). Where as here the statutory period has not yet expired when the debtors filed their bankruptcy petition, § 108 of the Bankruptcy Code (11 U.S.C. § 108) extends the time to "commence an action" until "two years after the order for relief"—that is, in this case, two years after November 14, 1983. This adversary proceeding was commenced in February 1984, well within the two-year period. Therefore, the limitations defense is without merit.

As set forth above, the Court now believes that, with the possible exception of the federal truth-in-lending statute, plaintiffs are not likely to prevail as against defendant SFG on any ground other than their claim based on the D.C. usury law. Nor does the Court believe that plaintiffs are likely to prevail at all on their claims against Lavonne Manley and Lavonne & Associates.

If, as the Court believes is virtually certain, plaintiffs do prevail on the usury claim, the issue remains as to what recovery or remedy is appropriate. D.C.Code §§ 28–3304 and 28–3305 set forth the recoveries and remedies allowable on account of unlawfully excessive interest. For purposes of these recoveries this Court is now inclined to regard the entire amounts of the loan origination fee ($7,800.00) and the broker's fee ($4,786.61), together with all interest and late charge payments made to date

as being "deemed to be payment made on account of principal," within the meaning of § 28–3305.

However, SFG has also violated § 28–3301 in other respects in addition to excessive interest. Thus, as to non-first-trust financing of residential realty, at the time SFG made its loan § 28–3301(c) prohibited balloon payments and required notes to be non-negotiable and to so state. SFG's loan violates both of these prohibitions. However, the statute as it existed on January 17, 1983 contained no provision specifying what recovery or damages might be appropriate for such violations. Nor at this stage of this proceeding is the Court persuaded that the debtors have suffered any damages as a result of SFG's violation of the balloon-payment and negotiability prohibitions. However, these are issues which need not and will not be decided now. They can await either the confirmation hearing on the debtor's plan or else the final trial of this adversary proceeding.

For the reasons stated above, the preliminary injunction is being continued and an order has already been entered so providing.