In re Frankie DAVIS, Debtor.

**FAMILY FEDERAL SAVINGS & LOAN, Plaintiff,**

**v.**

**William A. DAVIS, Jr., et al., Defendants.**

**Bankruptcy No. 84–00288.**
**Adv. No. 84–0212.**

United States Bankruptcy Court,
D. Columbia.

Aug. 8, 1994.

438

**440**

James Bruce Davis, Arlington, VA, for plaintiff.

James F. Lee, Jr., Washington, DC, for defendant David W. Manning.

Andrew Kline, Washington, DC, for defendant Bay State Sav. Bank.

Richard Boddie, Falls Church, VA, for defendant Nat. Mortg. Funding Corp.

*MEMORANDUM DECISION*

Louise A. Howells, Washington, DC, for debtor.

S. MARTIN TEEL, Jr., Bankruptcy Judge.

SUMMARY OF FACTS AND OF DECISION ................................. 441

PRINCIPAL FINDINGS OF FACT ......................................... 444

DISCUSSION ......................................................... 450

   I.  FAMILY FEDERAL'S CLAIMS AGAINST MANNING ................. 450
     A.  Compensatory Damage Claims .................................... 450
     B.  Punitive Damage Claim ......................................... 455
     C.  Contribution Claim ............................................ 455

  II.  FAMILY FEDERAL'S CLAIM FOR DECLARATORY RELIEF ........ 455
     A.  Breach of Duty To Davises ..................................... 456

 III.  CLAIMS AND COUNTERCLAIMS AMONG FAMILY FEDERAL AND WILLIAM AND PATRICE DAVIS ................................. 456

  IV.  COUNTERCLAIMS BY F. DAVIS AGAINST FAMILY FEDERAL ..... 457
     A.  Negligence and Breach of Contract ............................. 458
     B.  Usury ...................................................... 459
     C.  Truth in Lending Acts ......................................... 465
     D.  Unlawful Trade Practices ...................................... 466
     E.  Unconscionability and Overreaching ............................ 466
     F.  Real Estate Settlement Procedures Act ........................... 466

   V.  FRANKIE DAVIS'S CROSS–CLAIMS ............................. 467
     A.  Against Rae and Radford Financial ............................. 468
     B.  Against Manning ............................................. 468

  VI.  MANNING'S CROSS–CLAIMS ................................... 470
     A.  Against Rae and Radford ....................................... 470
     B.  Against W. & P. Davis ......................................... 470

 VII.  NATIONAL MORTGAGE'S CROSS CLAIMS ...................... 471
VIII.  BAY STATE'S CLAIMS ....................................... 471
     A.  Counterclaims Against Family Federal .......................... 471
     B.  Cross–Claim Against National Mortgage ........................ 472

CONCLUSION ....................................................... 472

This adversary proceeding was brought by Family Federal Savings & Loan ("Family Federal") against William A. Davis, Jr., ("William Davis"), Patrice Davis, Frankie M. Davis, Billie C. Rae ("Rae"), John Blair,[1] National Mortgage Funding Corp. ("National Mortgage"), Radford Financial Trust, Inc. ("Radford" or "Radford Financial"), David Whitfield Manning ("Manning"), and Bay State Savings & Loan ("Bay State"). The action arises out of a real estate settlement gone awry, resulting in claims, counterclaims and cross-claims by all of the parties on numerous statutory and common-law grounds. After a five-day trial, the court makes the following findings of fact and conclusions of law.

## SUMMARY OF FACTS AND OF DECISION

Because of the numerous claims asserted, it will be useful to highlight some of the more pertinent facts and to summarize the court's decision on some of the principal issues. Family Federal held a 1981 note (the "1981 Note") from William and Patrice Davis in an original principal amount of $40,000 secured by a second deed of trust on 5814 6th Street, N.W., Washington, D.C., owned by William Davis. On February 28, 1983, Family Federal foreclosed on the property. But pursuant to a Consent Order of February 28, 1983, entered in the bankruptcy case of William and Patrice Davis, they were given 30 days to pay off Federal Family by way of refinance or sale: if that occurred, Family Federal would cancel and not record the foreclosure deed. William and Patrice Davis arranged to sell the property to William's mother, Frankie Davis, who lived at the property.

Frankie Davis arranged new mortgage financing from National Mortgage through Rae and his company, Radford Financial. Manning acted as settlement attorney. National Mortgage sent the loan proceeds in the form of a check for $73,643.63 and Manning endorsed that check over to Radford Finan-

cial. At the same time, Manning withdrew from performing any new work for Radford Financial.

Because of prior liens on the property, the National Mortgage loan was insufficient to pay off $7,430 of Family Federal's debt, a $200 settlement fee owed Family Federal and a $8,400 finder's fee charged by Radford Financial. To cover this shortfall, Radford took a $16,030 note from Frankie Davis, secured by a new second deed of trust (junior to National Mortgage's deed of trust), and executed a partial assignment of that note to Family Federal to cover Family Federal's shortfall. Radford mailed a check on its account to Family Federal for $45,641.70, together with the partial assignment. However, Family Federal insisted that any note for the shortfall be made payable to it instead of to Radford Financial. Eventually, a replacement note to Family Federal was prepared by Radford and executed by Frankie Davis, in the amount of $13,601.61.

While waiting for the corrected note, Family Federal retained the $45,641.70 check. When the check was finally presented for payment, there were insufficient funds in Radford Financial's account and the check was dishonored. Radford had gone out of business; Rae subsequently filed a Chapter 7 bankruptcy case and his estate produced little dividend for unsecured creditors.

For reasons that are fully developed below, the court concludes that Family Federal was negligent and breached contractual obligations by accepting a check on Radford Financial's general account and holding the check for as long as it did. Manning was negligent and breached his fiduciary duties as a settlement attorney by turning over to Radford the National Mortgage loan proceeds. Moreover, Family Federal's original loan to William and Patrice Davis was usurious, and Family Federal violated the federal Truth-in-Lending Act in making the second mortgage loan.

---

1. Family filed a Stipulation of Dismissal as to all matters and claims against John Blair on Octo-

ber 5, 1987. See Docket Entry ("DE") 285.

The more difficult issues arise in sorting out the consequences. It is perhaps easiest to begin with a summary of the relief granted. Because the negligence of Family Federal and Manning (along with Rae and Radford Financial) caused the losses in this case, they must bear those losses. The court's guiding principle is to place the parties in the positions they would have occupied but for the breaches of duty by Manning and Family Federal.

The primary result of that negligence was that the $45,461.70 check was dishonored. If the check had been timely deposited, and after adjusting for usurious interest accrued or collected on the 1981 Note, the 1981 Note would have been repaid in full. Moreover, Frankie Davis would have had to borrow less from National Mortgage in order to repay the 1981 Loan. Therefore, as compensatory damages, Family Federal (1) will credit $45,-461.79 to the 1981 Note as of the date it received the check, and (2) will pay Frankie Davis the amount of the additional interest Frankie Davis incurred in borrowing from National Mortgage to pay the excess amount on the 1981 loan. Family Federal must account for, and return to the Davises, all payments it collected in violation of the usury laws, including payments on the $16,030 and $13,601.61 note, and must pay Frankie Davis $1,000 for violation of the Truth-in-Lending Act and attorney's fees expended in establishing the violation of that Act. Moreover, Family Federal retains no lien on the property, because there is no balance owed to Family Federal after crediting the bounced check and remedying its violation of the usury laws of the District of Columbia. Thus, Frankie Davis holds title to the property, and National Mortgage holds a first lien deed of trust on the property to secure its loan to Frankie Davis. Manning will be ordered to pay punitive damages to Frankie Davis in the amount of the reasonable attorney's fees she incurred in this adversary proceeding (with a credit for any amounts collected from Family Federal as to attorney's fees incurred in the Truth-in-Lending aspects of this proceeding). Finally, Family Federal will have a right to contribution from Manning, subordinated to Frankie Davis's punitive damage award, for one-half of the lost $45,641.70. The ratio-

nales for granting this relief are summarized below.

■ Where a loss must be apportioned, the innocent parties (the Davises and National Mortgage) should be put in the position they would have occupied but for the misconduct of the culpable parties (Manning, Family Federal, Rae and Radford Financial). As to Manning, Rae and Radford Financial, there can be no doubt about this outcome, or its bases. As to Family Federal, none of the parties has clearly articulated the bases upon which this result is reached, but the court believes it is compelled on each of three alternative bases: tortious negligence, breach of an implied contractual obligation arising from the Consent Order and the 1981 Note, and breach of the obligation to mitigate damages arising from the 1981 loan agreement.

■ First, Family Federal owed a duty of care, which it breached, to the three Davises and to National Mortgage. When Family Federal participated in the closing and settlement, it had a duty to act in a commercially reasonable fashion. While a negligent tort ordinarily gives rise to a damage claim, equity may step in to place the parties in the position they ought to have been in; equity deems done that which ought to have been done.

■ Second, the court finds an implied contract between the parties for Family Federal to participate in a commercially reasonable fashion in the process of William and Patrice Davis selling their home to their mother and securing financing for her. In other words, Family Federal had an implied obligation under the Consent Order and the 1981 Note to act in a commercially reasonable fashion in participating in the Davises effort to sell or refinance their property. *See Tymshare v. Covell,* 727 F.2d 1145, 1151–53 (D.C.Cir.1984) (concluding, *id.* at 1152, that "the doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes 'bad faith' "). The remedy for breach of this implied contract is to place the

innocent parties where they would have been but for the breach.

■ Third, like any contract, the 1981 Note carried with it a duty on the part of Family Federal to mitigate damages upon breach. *American Mortgage Inv. Co. v. Hardin–Stockton Corp.*, 671 S.W.2d 283, 286 (Mo.App.1984). Had Family Federal performed in a commercially reasonable fashion, all of its claim would have been paid from National Mortgage's loan.[2]

■ Family Federal claims that it is entitled to recover from Manning. However, Family Federal was contributorily negligent and is thus barred from recovering on account of Manning's negligence. Similarly, if Family Federal has any claim sounding in contract, it cannot recover on such claim because it failed to mitigate its damages. Nonetheless, the court views Family Federal and Manning as concurrent tort feasors, in that each violated the duty of care it owed to the Davises and National Mortgage, and they jointly caused the loss of the funds by their combined negligence. Family Federal is therefore entitled to contribution from Manning in the amount of $22,870.85, one-half of the check that was dishonored.

Frankie Davis, National Mortgage, and William and Patrice Davis have claims against Manning for his breach of fiduciary duty and, as to them, there is no off-setting contributory negligence or failure to mitigate damages. However, except for a punitive damage claim, this breach is of little consequence because National Mortgage and the Davises are granted relief against Family Federal to place them in the position they would have been in had Manning and Family Federal not breached their duties, and the new financing transaction had gone as planned.

■ Both Frankie Davis and Family Federal seek punitive damages against Manning. The court finds that Manning was not reckless with respect to the rights of Family

Federal because he left Family Federal in a position to protect its own rights. It was within Family Federal's power, acting with ordinary care, to avoid any harm from Manning's acts. Accordingly, the court will not award Family Federal punitive damages against Manning.

However, the court concludes that Manning did act recklessly with respect to Frankie Davis. As settlement attorney, Manning represented Frankie Davis's interest and knew that she had no control over the disposition of the check issued by National Mortgage. By delivering that check to Radford and failing to ensure it would be used to repay Family Federal, Manning acted in clear disregard of his most obvious duty to Davis.

■ As a general rule, punitive damages are not awarded unless there are compensatory damages. Compensatory relief is being accorded Frankie Davis by way of crediting the bounced check against the 1981 Note, and that is an adequate foundation for awarding punitive damages against Manning, whose conduct necessitated the award of compensatory relief. The court finds that punitive damages are warranted in the amount of the reasonable attorney's fees and costs sustained by Frankie Davis in this adversary proceeding.

Family Federal raises claims against William and Patrice Davis for payment of the balance on the 1981 Note. Those claims fall based on Family Federal's negligence and breach of contract. As noted above, if Family Federal had acted reasonably and so collected on the check, there would be no balance owing on the 1981 Note.

As to Frankie Davis's counterclaims against Family Federal, she is entitled to recover against Family Federal on her claim that the 1981 Note was usurious and for violation of the federal Truth-in-Lending Act. All of her remaining counterclaims must be dismissed.

---

**2.** As the parties envisioned the transaction, all of Family Federal's claim except for the $7,630 shortfall would have been paid from National Mortgage's loan, and the 1981 Note would have been replaced by the new note for the shortfall, secured by a second lien upon the property. However, as discussed below, the loan proceeds would in fact have paid the entire balance of the 1981 Note after adjusting that note to remedy its usurious nature.

Frankie Davis has brought various cross-claims against Rae and Radford Financial. Rae and Radford have not appeared or defended themselves in this proceeding. Accordingly, Frankie Davis will be granted judgment against them by default.

Similarly, Manning's cross-claims for indemnification against Rae and Radford Financial will be ordered by default.

Manning has cross-claimed against William and Patrice Davis as well, based on their failure to inform him of their bankruptcy proceeding. That cross-claim must be dismissed because Manning has failed to prove that the Davises' alleged negligence had any causal connection to the damages in this case.

National Mortgage assigned its deed of trust loan to Bay State. Bay State has counterclaimed against Family Federal and has cross-claimed against National Mortgage. Those claims are mooted by the court's ruling that National Mortgage's deed of trust is a first priority lien on the property.

National Mortgage cross-claimed against Manning, Rae and Radford for indemnification of any judgment recovered against it. Because Bay State is not entitled to recover against National Mortgage, this cross-claim is also moot.

## PRINCIPAL FINDINGS OF FACT

Frankie Davis purchased property known as 5814 6th Street, N.W., Washington, D.C. with her former husband in 1956 and has lived there to the present date. When she and her husband were divorced, the property was deeded to their son, William Davis. Frankie Davis paid all of the bills relating to the house, such as the first mortgage to Cameron Brown and utilities. She deducted the interest on the first mortgage on her tax return, and never paid rent for living in the house. William Davis never paid any bills on the house except for loans taken by him secured by deeds of trust against the property.

On or about July 1, 1981, co-defendants William and Patrice Davis, husband and wife, executed and delivered a note (the "1981 Note") secured by a second deed of trust on 5814 6th Street, N.W., Washington, D.C. in the principal amount of $40,000.00 to Gilbert G. Olsen & Associates, Inc. ("Olsen"). The first deed of trust was held by Cameron Brown. Olsen subsequently endorsed the note and deed of trust to plaintiff Family Federal.

On his loan application with Olsen, William Davis indicated that he was receiving $400.00 per month from rental property. William Davis also submitted a personal financial statement dated June 12, 1981, indicating that he was receiving rent from his mother in the amount of $4,800 per year. Also in connection with his loan application with Olsen, William Davis made a written statement that the "loan is to me [sic] made on rental property in Washington, D.C. and the proceeds are to be used for investment purposes."

William Davis was told by people at Olsen to make the statement that the loan proceeds were to be used for business purposes, and that he had to do to so in order to obtain the loan. The personal financial statement submitted with his loan application is inaccurate because William Davis was not receiving rental payments from his mother. At the time he filled out the application, William Davis did not have any business or other business investments. The people at Olsen knew that Frankie Davis was living in the house and paying the first mortgage and the other expenses on the property. Approximately $16,000 of the $40,000 loan proceeds were used to pay off prior liens on the property. Additionally, there was a discount fee of $8,750.00. William Davis used the remaining proceeds to pay bills.

On October 13, 1981, William and Patrice Davis filed a voluntary petition for relief under Chapter 13 in the United States Bankruptcy Court for the Northern District of Georgia. On December 20, 1982, Family Federal filed a complaint against William and Patrice Davis in the United States Bankruptcy Court for the District of Columbia for a declaratory judgment and to terminate the automatic stay which was in effect due to the Georgia bankruptcy proceeding. Family Federal and William and Patrice Davis entered into a Consent Order on February 28, 1983.

William Davis consulted with an attorney before he signed the Consent Order. The Consent Order provides that the debtors, William and Patrice Davis, waive "all claims of any nature, in law or equity, against [Family Federal]." William Davis did not believe that he had any claims against Family Federal and accordingly believed that the waiver of claims language in the Consent Order was meaningless. The Consent Order further provided that Family Federal "shall foreclose on said note on February 28, 1983 and ... said foreclosure shall not be challenged by the debtors or debtors [sic] predecessors in interest. Debtors acquiesce in the foreclosure to be held, and agree to commence no action in law or equity to set the same aside or challenge the validity thereof." The Consent Order further provided that "Debtors shall have 30 days from the date of the sale to obtain refinancing or a purchaser for the property, which purchaser shall pay off [Family Federal] in full." Failing such repayment, the Consent Order provided, Family Federal "shall record the trustees [sic] deed, and the debtors shall surrender possession." A foreclosure sale was held on February 28, 1983, and Family Federal was the successful bidder at approximately $32,-000.00. The Consent Order was approved by Judge Whelan for this court on March 30, 1983. Frankie Davis was not a party to the Consent Order.

When William Davis defaulted on the 1981 Note, Frankie Davis learned from a neighbor that a notice of foreclosure sale for the house appeared in the newspaper. Trying to forestall the foreclosure, Frankie Davis paid $200 to one Frank Outlaw who put her in touch with Rae. Frankie Davis met with Rae at Radford Financial's office at 1725 K Street, N.W., Washington, D.C. Rae eventually introduced her to Manning.

Manning, a sole practitioner with an office in Alexandria, Virginia, had experience in settling real estate transactions. In the fall of 1982, Manning applied for a part-time position with Radford as a settlement agent. Manning was hired by Radford on January 7, 1983, and was provided with business cards, stationery and an office. Manning was permitted to maintain his own law practice. At Radford Financial, Manning was to be responsible for the entire settlement process. Manning received monthly checks based on the number of settlements he conducted. Social security taxes were deducted from his paychecks.

Rae, acting in his individual capacity and as President of defendant Radford Financial, arranged for National Mortgage to make a loan to Frankie Davis to pay off the existing liens on the subject property, including Family Federal's lien. The property would be conveyed by William and Patrice Davis to Frankie Davis.

On May 9, 1983, a settlement was held at which all liens on the property, including the lien of Family Federal, were to be paid off. Defendant National Mortgage, as the new lender to Frankie Davis, was to be given a first trust on the property. The settlement was conducted by Manning.

While meeting with Manning on May 9, 1983, at the Radford offices on K Street in Washington, D.C., Frankie Davis obtained a business card from Manning that listed his Alexandria office address. Manning disputes this and claims that he gave Frankie Davis a business card from Radford which designates him as settlement counsel. However, Frankie Davis kept a notebook containing her handwritten notes regarding the settlement and copies of some of these pages were admitted into evidence. A copy of Manning's personal business card with the word "settlement" written across it appears on one of these pages. Accordingly, the court finds that Manning gave Frankie Davis his personal business card with his Alexandria office address.

Further, although neither she nor William and Patrice Davis asked Manning to represent them, nor did they directly pay Manning any money, the court finds that Frankie Davis and William and Patrice Davis relied upon Manning as their settlement attorney. Rae told Frankie Davis that Manning was going to take care of her in the settlement; and, at some point outside of Manning's presence, Rae informed Frankie Davis that Manning is an attorney. There is no evidence of any representation being made to the parties

at the settlement that Manning was acting merely as an employee of Radford Financial.

Harold Messner ("Messner") was an employee of Family Federal whose duties included monitoring and overseeing the lending and servicing of loans and disbursements to investors. Messner received a call from Rae, who stated that Radford was providing financing for the Davises. By letter dated March 30, 1983, and signed by B.C. Rae as President, Radford confirmed to Family Federal that it was committed to provide Frankie Davis a first trust loan. The letter states that it was Radford Financial's understanding that Family Federal would "discontinue foreclosure proceedings and not record the Deed of Trust with this commitment."

On April 5 and 6, 1983, Radford conducted a mortgage loan training seminar or meeting with members of National Mortgage. Rae introduced the staff of Radford Financial, including Manning, to the people from National Mortgage, including Ralph Reinecke ("Reinecke"), President. Manning, who was listed as Settlement Counsel on the Training Schedule, gave a lecture on settlement procedures. Rae informed Manning that Radford and National Mortgage were entering into a business relationship which would generate a great deal of activity between the two companies.

Reinecke had previously met with Rae, who was trying to establish a correspondent type of relationship (where a full service mortgage banker provides services to an originator) with National Mortgage. By letter dated March 30, 1983, National Mortgage informed Rae of the conditions that needed to be met in order for Radford to originate and process FHA and VA loans. In the letter, Reinecke states that "the way I see the operations unfolding is for the settlement offices to originate loans...."

In Washington, D.C., a settlement agent need not be an attorney. A settlement agent may be an attorney, or it may be a title insurance company approved by a lender. As a practical matter, the settlement agent must have a relationship with a title insurance company, either as an approved attorney or as an agent for the company.

National Mortgage always obtained an insured closing letter from the settlement agent or they would not go through with the settlement. An insured closing letter is a letter from a title insurance company that it will provide coverage to protect the parties involved in the closing in the event of fraud or negligence. The letter comes from the title company for which the settlement agent works. After receiving an insured closing letter, National Mortgage would send instructions to the settlement attorney and designate the attorney as their agent to settle the loan.

By letter dated March 31, 1983, addressed to Manning at his Alexandria office, National Mortgage forwarded their standard settlement instructions, and requested Manning to provide National Mortgage with "insured closing letters from all of the title companies that you do business with." By letter dated April 5, 1983, First American Title Insurance Co. ("First American") advised National Mortgage that "Manning is an Approved Attorney with this company, and as such is covered by the Insured Closing Service of First American Title."

The settlement instructions from National Mortgage, dated May 5, 1983, were addressed to David W. Manning. The instructions authorized Manning to settle the $75,600 loan to Frankie Davis, and stated that he was authorized to settle the loan, "acting as our agent for the recordation of the deed of trust and rider (if applicable), and complying with the foregoing instructions" (original in all capitals). Further, the settlement instructions provided that "[t]he placement of secondary financing in conjunction with this loan settlement without written approval from this office will cause these instructions to be null and void." The letter accompanying the loan proceeds from National Mortgage was directed to David W. Manning, with no mention of Radford Financial.

By letter dated April 14, 1983, addressed to Manning at his Alexandria office, Jo Anne Scarborough of the Loan Payoff Department of Family Federal informed Manning that the total amount due on the 1981 Note through April 20, 1983, was $52,471.70. The pay-off figure included $4,200 in extension

fees for the seven month period from September 1982 through March 1983, attorney fees in the amount of $1,030.45, and a charge of $241.25 for the Washington Times and Thomas Owen (expenses relating to the foreclosure). Prior to settlement, Rae called Reinecke and informed him that there was a problem with the funds being sufficient to meet all the conditions for settlement and asked National Mortgage to cut some of their settlement fees. National Mortgage cut a point off the settlement charges and later cut another point.

The Settlement Statement, dated May 9, 1983, and signed by Frankie Davis, as Purchaser, and William and Patrice Davis, as Sellers, indicates a contract sales price in the amount of $84,000 and settlement charges in the amount of $3,031.57, for a total amount due from the borrower of $87,031.57. The Settlement Statement also indicates the amounts to be paid by or on behalf of the borrower as follows: deposit or earnest money—$4,200; principal amount of loan—$75,-600; gift letter—$7,231.57. Payoffs on the first and second mortgage loans through May 20, 1983, are shown in the amounts of $26,926.73 and $45,641.70, respectively. The Settlement Statement was prepared at Radford under Manning's supervision.

William Davis did not give Frankie Davis any money pursuant to the gift letter, nor did Frankie Davis put down earnest money in the amount of $4,200. No money changed hands at the May 9 settlement. The gift letter was to have the effect of Frankie Davis actually paying less money than the agreed upon price.

Nonetheless, Manning prepared an Attorney's Final Certificate for First American which indicates that a Warranty Deed conveying the property from William and Patrice Davis to Frankie Davis for a consideration of $84,000, and a Deed of Trust in the principal amount of $75,600 from Frankie Davis to National Mortgage, were to be recorded. The Certificate also indicates that "full consideration has been paid and properly disbursed ..." The Certificate is signed Radford Financial, Approved Attorney, by Manning, member of firm.

Prior to settlement, Manning received information that the amount being loaned by National Mortgage was to be $79,000, and he believed that Frankie Davis would have to bring several thousand dollars to the settlement table to make up for the shortfall. When he received the settlement instructions from National Mortgage, Manning learned that the loan amount was only $75,600 and realized that there would be a shortfall of about $7,400.00. Rae told Manning that the parties had agreed to execute a second trust note for the shortfall. However, the Settlement Statement for the $75,600 loan from National Mortgage does not indicate that there was to be a second trust.

A separate Settlement Statement was prepared with respect to the second trust. This Settlement Statement indicates that Radford made a second trust loan to Frankie Davis and William and Patrice Davis in the amount of $16,030 with interest at a rate of 15% per annum. The $16,030 principal amount consists of a $8,400 finder's fee to Radford Financial, an assignment of loan proceeds to Family Federal in the amount of $7,430, and settlement costs of $200. A Deed of Trust Note payable to Radford Financial Trust, Inc. in the amount of $16,030 was signed by Frankie Davis and William and Patrice Davis. A Deed of Trust, dated May 9, 1983, securing Radford in the amount of $16,030 was signed by Frankie Davis. The $16,030 note payable to Radford was eventually cancelled and replaced by the $13,601.61 note, although not until after at least two payments were made on the $16,030 note.

The Settlement Statement for the Second Trust Loan in the amount of $16,030 was prepared under Manning's supervision. Manning treated the transaction as two separate settlements, the first being the loan from National Mortgage, the second being the second trust to Family Federal.

By letter dated May 11, 1983, Radford forwarded the first settlement statement and other settlement documents from the May 9 settlement to National Mortgage. The second settlement statement and related documents were not transmitted. The letter states that "[i]t has been a pleasure for Radford Financial to serve as settlement agent in

this matter" and Manning's name is signed by someone else.

A check dated on or about May 18, 1983, in the amount of $73,643.63 and issued by National Mortgage payable to Manning was received by Manning. Outside of settlements with Radford Financial, Manning deposited funds received at settlement in a fiduciary account. In this case, however, Manning endorsed the check over to Radford Financial. Rae deposited the check into Radford Financial's general operating account at First American Bank. Radford also maintained an escrow account, but Manning did not have authority to write checks on that account.

On May 19, 1983, Radford Financial, by its President, Rae, issued a check to Family Federal in the amount of $45,641.70 to pay off the Family Federal lien. By letter dated May 20, 1983, written on Radford stationery and signed by B.C. Rae as President, Family Federal received, by mail, the check and the assignment of $7,431.57 of the $16,030 promissory note and deed of trust executed to Radford Financial.

Thereafter, Manning received a call from Messner who stated that he was not satisfied with the second deed of trust. Manning told Messner that he did not negotiate the terms of the note and that Messner should talk to Rae. Manning informed Messner that he was no longer associated with Radford Financial. Messner called Rae and informed him that Family Federal did not want the second trust made out to Radford Financial, but to Family Federal. Rae informed Messner that he would take care of the matter, and Messner gave Rae seven days in which to correct the deed of trust.

Family Federal did not take any action after Rae failed to correct the documents within seven days. Messner put the check along with the other documents in the file. Messner did not cash the check. Instead, he waited until Family Federal received the corrected documents from Rae. Messner had concerns about receiving the $7,430 shortfall from Radford and felt that depositing the check would compromise Family Federal's security on the balance owed on 1981 Note.

Family Federal did not believe it could cash the check and record its foreclosure deed.

As a matter of policy, Family Federal generally required that checks it received were either certified or cashier's checks. Messner was very uncomfortable that the $45,641.70 check was drawn on Radford Financial's general account, and not on an escrow account. It was also the policy of Family Federal to deposit checks on the date received and release deeds of trust within 30 days. Deeds of trust would not be released, however, until the check cleared.

Messner was also uncomfortable with Rae. Messner had previously sent a resume to Rae in response to a blind ad for employment, but did not pursue the job after hearing in the financial community that Rae did not pay his commissions. Messner's opinion of Rae worsened as the transaction proceeded. Rae had assured Messner that there would be enough money to pay everyone off on the closing date, and only on that day was Messner informed there was not enough money. Messner knew there were several risks involved in this transaction, including the possibility that the check would bounce.

By letter dated June 29, 1983, Family Federal received a second Deed of Trust Note (the "Second Trust Note"), dated June 16, 1983, signed by Frankie Davis and William and Patrice Davis, which reflects a loan from Family Federal in the amount of $13,601.61 with interest at a rate of 15% per annum. Family Federal also received a second Deed of Trust, dated June 16, 1983, signed by Frankie Davis, which secured the Second Trust Note, and an Irrevocable Assignment to Radford Financial of $6,171.61 of the note.

Until June 23, 1983, there were sufficient funds in Radford Financial's general account to cover the $45,641.70 check. However, the check was not deposited until on or about July 18, 1983, at which point it was dishonored. Messner then ascertained that Radford had been evicted from its K Street premises and was no longer in business.

Messner never informed National Mortgage that Family Federal was holding the check from Radford Financial. When the check was dishonored, Family Federal di-

rected counsel to contact National Mortgage. Counsel for Family Federal wrote to National Mortgage informing it that the check was dishonored. When National Mortgage learned that there was a problem with the settlement, it contacted First American to press them to issue their title policy.

A factual issue was raised regarding whether National Mortgage was apprised before the May 9, 1983, settlement that there would be secondary financing and whether it gave its approval for such financing. Manning testified that he was not sure whether he or Rae called Reinecke at National Mortgage to obtain approval of secondary financing, but that he learned that secondary financing had been approved. Admitted into evidence are what Manning claims to be handwritten notes of telephone conversations he had with Messner of Family Federal and Reinecke of National Mortgage on May 10, 1992. The note relating to Reinecke states that Reinecke will give Manning written approval for secondary financing on the Davis loan.

However, Reinecke testified that he does not recall having any conversations with Rae or Manning regarding secondary financing. Reinecke testified that had there been such a request, National Mortgage would have looked at the loan again and found that there was no room to put a second trust. National Mortgage's loan to Frankie Davis was a 90% value loan, *i.e.*, the principal loan amount of $75,600 equaled 90% of the contract price of $84,000. Reinecke testified that he did not believe the Fannie Mae guidelines allowed secondary financing on 90% value loans. Reinecke also testified that he believed that the loan to Frankie Davis included negative amortization, meaning that the payments were not sufficient to pay interest and the loan had an increasing principal balance. With such a loan, Reinecke testified, it would not have been wise to allow a second trust. Reinecke further testified that the loan would have to have been underwritten with the terms of the second trust and a determination made of the borrower's ability to

make the payments due under both obligations.

A Federal National Mortgage Association Affidavit of Purchaser and Vendor, signed by the Davises on May 9 and May 10, 1983, indicates a total purchase price of $84,000, with a first mortgage in the amount of $75,600 and cash equity of $8,400. The Affidavit indicates that there was no secondary financing. The Affidavit is a form required by Fannie Mae which summarizes the terms of financing to show what liens are being placed on the property. The Affidavit is also signed by an officer of National Mortgage, representing that the statements in the Affidavit are true and correct to the best of its knowledge. The Affidavit of Purchaser and Vendor would be packaged with the note and deed of trust and be sent to the investor purchasing the note.

National Mortgage sold the note from Frankie Davis to Bay State.[3] National Mortgage represented to Bay State that it held a first trust against the property and that there was no secondary financing. The loan to Frankie Davis was designed to meet Fannie Mae requirements, and the records relating to the purchase of the note indicate that the board of directors of Bay State approved the purchase of Fannie Mae conforming first trusts. The Affidavit of Purchaser and Borrower warrants that the loan meets Fannie Mae requirements. Bay State would not have purchased the Frankie Davis note from National Mortgage if Bay State knew there was a second deed of trust, because the note would not have met its buying criteria.

Based upon Reinecke's testimony and the fact that National Mortgage sold the loan to Bay State, warranting that the loan was not subject to secondary financing, the court does not credit Manning's testimony that he obtained approval for the secondary financing. The court finds that National Mortgage never gave written approval for the secondary financing by Family Federal as required by the terms of the settlement instructions.

By letter dated May 9, 1983, Manning tendered his resignation from Radford Fi-

---

3. Bay State converted from a state chartered to a federal chartered bank and changed its name to Washington Savings Bank. For purposes of this opinion, however, the bank will be called Bay State.

nancial, effective immediately. The events of the May 9 settlement were a motivating factor in Manning's resignation. Manning felt that the $8,400 finder's fee was too high. In the past, Manning also had concerns regarding Radford Financial's practice of listing the entire amount of its fee as an attorney's fee because this was not the amount being paid to him. Manning believed there were ethical problems because it is improper under the code of ethics for nonlawyers to receive attorney's fees.

Further, Manning resigned because he disliked working with the people at Radford Financial, claiming they were disorganized. Manning felt Radford engaged in too much wheeling and dealing. Manning testified he would come in to close settlements that were not ready to be closed because there was not enough money, and they would then have to get permission for second trusts and execute new deeds without enough time to prepare.

After resigning, Manning undertook to complete certain settlements, including the Davis transaction. Manning helped Frankie Davis get some records to show that certain judgments had been released and forwarded those documents to her.

Although Manning was a part-time employee of Radford Financial, the court finds that he was acting as the settlement agent at the May 9, 1983, closing. National Mortgage received an insured closing letter from First American advising National Mortgage that Manning was "an approved attorney." The settlement instructions were sent to Manning and authorized him—not Radford—to close the loan, acting as National Mortgage's agent. Further, National Mortgage forwarded the loan proceeds by check payable to Manning. If not acting as the settlement agent, Manning should have so informed National Mortgage, rather than going through with the settlement. Documents sent to the parties after the May 9 closing which indicate that Radford was the settlement agent do not change the fact that at the closing the parties were relying upon Manning as the settlement agent.

4. For convenience, this opinion and any accompanying orders will generally refer to Family

Columbia First Bank, the successor in interest to Family Federal, holds the $40,000 Note and the $13,601.61 Second Trust Note. It appears that at least $10,120.00 has been paid to Family Federal [4] by Frankie Davis, disregarding the bounced check from the National Mortgage loan proceeds.

To date, Family Federal has not recorded the deed from the February 28, 1983 foreclosure sale. Family Federal's deed of trust remains unreleased. Family Federal is collecting the entire amount of the Second Trust Note and making no disbursements to Radford on account of the Irrevocable Assignment.

The Deed of Trust securing the obligation of Frankie Davis to National Mortgage was recorded among the Land Records of the District of Columbia on May 24, 1983.

### DISCUSSION

This discussion sets forth in greater detail the court's conclusions of law, along with more specific findings of fact pertinent to the various issues.

### I. FAMILY FEDERAL'S CLAIMS AGAINST MANNING

Family Federal seeks compensatory and punitive damages against Manning. As set forth in detail below, the court finds that Family Federal's negligence and failure to mitigate damages preclude recovery of compensatory damages, and Manning's conduct with respect to Family Federal does not warrant the imposition of punitive damages. Nonetheless, as Family Federal and Manning are concurrent tort feasors responsible for the Davises' losses, Family Federal does have a right of contribution against Manning.

#### A. Compensatory Damage Claims

Family Federal seeks a judgment against William and Patrice Davis in the amount of $45,641.70, and punitive damages against Manning in the amount of $100,000 on the grounds that Manning was negligent and that he breached his fiduciary duty to Family Federal by turning the loan proceeds from

Federal, and all such references shall be deemed to include Columbia First Bank, as appropriate.

National Mortgage over to Radford, and by failing to oversee the disbursement of the loan proceeds and the release of all deeds of trust. Manning claims that he was a part-time employee of Radford Financial, and that Radford, not he, was the settlement agent at the May 9 closing.

The court finds that Manning was the settlement agent for the May 9 settlement and was negligent in turning over the loan proceeds from National Mortgage to Radford and in failing to ensure their proper disbursement. The letter sent by Manning to Family Federal requesting a payoff statement was written on stationery for David Whitfield Manning, Attorney at Law, with his office address in Alexandria. The letter states that "[t]his office will be settling a real estate transaction ..." and contains no mention of Radford Financial. There is no indication in the letter that Manning was acting on behalf of Radford, that Manning was merely a part-time employee of Radford, or that Radford would be acting as the settlement agent. Jo Anne Scarborough of the Loan Payoff Department of Family Federal informed Manning of the payoff figures by letter sent to him at his Alexandria office. Manning's explanation that he ran out of Radford stationery does not excuse him for failing to identify himself as an employee of Radford and to expressly inform Family Federal that Radford Financial, not Manning, would be conducting the settlement if that was in fact the case.

Further, Manning's expert agreed that if a company were doing the settlement, the normal procedure would be for the company that was doing the settlement to obtain an insured closing letter for the company, not the attorney or individual. Manning's expert agreed that it would not be prudent for a lender to turn over settlement funds to someone who is not protected by an insured clos-

ing letter. Further, Manning's expert testified that when an attorney receives a check payable to him as an attorney at law, along with instructions by the lender that states that the attorney is acting as the lender's agent, the attorney should either return the check and say "I'm not your agent", or take the check and say "I'm your agent." Thus, by accepting the check and the settlement instructions from National Mortgage and proceeding with the settlement, Manning assumed the role of settlement agent.

By acting as the settlement agent for the closing, Manning assumed the duties of an escrow agent. *See, Ferguson v. Caspar*, 359 A.2d 17, 20 (D.C.App.1976) (where parties employ a third person to accept their respective tenders of performance under a contract, a valid escrow arrangement is created). An escrow agent occupies a unique position and serves as the dual agent of the parties until the performance of the escrow agreement, whereupon he becomes the agent of each of the parties to the transaction in respect to those things placed in escrow to which each party has thus become entitled. *Wagman v. Lee*, 457 A.2d 401, 404 (D.C.App. 1983), *cert. denied*, 464 U.S. 849, 104 S.Ct. 158, 78 L.Ed.2d 145 (1983). Absent forfeiture or settlement, an escrow agent has no right to surrender the deposit.[5] *Wagman v. Lee*, 457 A.2d at 404.

Manning argues that neither he nor Radford owed a fiduciary duty to Family Federal and that Family Federal was contributorily negligent by failing to present the check within a reasonable period of time. In response, Family Federal asserted the additional claims of breach of contract and conversion against Manning, arguing that the defenses of contributory negligence and assumption of risk do not apply to these theories.[6]

---

**5.** Even Manning's expert witness testified that the attorneys in his office who conduct closings have in every instance an obligation to deposit funds in an escrow account. When testifying that an attorney who works for a settlement company should turn funds over to the company's settlement account, Manning's expert was assuming that the settlement company had a relationship with a title company. Manning's expert testified that as a practical matter, in

order for a corporation to be able to do settlements, it would have to induce some title insurance company to insure its work. There is no evidence that Radford Financial had such a relationship with a title insurance company.

**6.** In its amended complaint, Family Federal sought recovery from Manning only on the grounds of negligence, breach of fiduciary duty, and breach of trust, but in its post-trial brief

In *Wagman v. Lee,* 457 A.2d at 404, the court found that claims that the escrow agent misapplied funds sounded in tort, rather than contract, based upon the fiduciary relationship between an escrow agent and the depositor. In this case as well, the court finds that Family Federal's claim against Manning sounds in tort and not in contract. Contrary to its claims, Family Federal was not merely a third-party beneficiary providing payoff information to Manning in order to receive payment in the amount of its deed of trust against the property. Family Federal held a trustee's deed to the property as a result of the foreclosure sale held on February 28, 1983. Family Federal was, in essence, selling the property to Frankie Davis at the May 9, 1983, settlement, and was providing partial financing to Frankie Davis by agreeing to accept a second deed of trust rather than full payment of the 1981 Note to William and Patrice Davis. While Manning claims he was not aware of the foreclosure sale, he was aware of Family Federal's agreement to provide secondary financing to Frankie Davis.

▆ Thus, the court concludes that Family Federal was a party to the transaction and that Manning, as settlement agent, owed Family Federal a fiduciary duty to conduct the transaction with honesty, skill and diligence. *See Wagman v. Lee,* 457 A.2d at 405. Acting as the settlement agent, Manning had no right to entrust the funds to Radford and walk away from the transaction. *See, Washington Loan & Trust Co. v. Colby,* 108 F.2d 743, 747 (D.C.Cir.1939) (trustee personally liable when he entrusts trust funds to another for reinvestment and the funds are lost through the dishonesty or negligence of the other); *Republic Nat'l Bank & Trust Co. v. Bruce,* 105 S.W.2d 882 (Tex.Com.App.1937) (if a person takes upon himself the management of property for the benefit of another, he has no right to impose that duty on others, and mere abandonment of the trust will not vest the trust property in the hands of a cotrustee nor relieve a trustee from liability). Accordingly, the court finds Man-

ning was negligent and breached his fiduciary duty to Family Federal.

However, Manning asserts the defenses of assumption of risk and contributory negligence. The distinction between these two defenses has been explained as follows:

"Assumption of risk is an available defense when a plaintiff voluntarily has incurred a known risk." The key word is "voluntarily." ... Most commonly, this defense "means voluntary exposure to a reasonable risk; *e.g.,* attendance at a baseball game, where balls are hit sharply into the stands."

In contrast, contributory negligence is "unreasonable conduct," *i.e.,* "conduct 'which falls below the standard to which a plaintiff should conform for his [or her] own protection' and contributes to the plaintiff's injury." When a situation may be considered a "voluntary exposure to an unreasonable risk," thereby merging the principal elements of each defense, we arbitrarily classify this hybrid, by reference to unreasonable risk-taking, as a type of contributory negligence. [Citations omitted.]

*District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.App.1987).

Here, the court finds that Family Federal voluntarily and negligently exposed itself to an unreasonable risk by holding the check from Radford for approximately two months. Radford issued the $45,641.70 check on May 19, 1983. Messner testified that he noted that the check was drawn on Radford's general account, not on an escrow account, which made him very uncomfortable with the transaction and with Rae. It was Family Federal's policy to require certified checks or cashier's checks and to deposit them on the date received. Instead, Messner put the check in the file and held it for approximately two months. On these facts, Family Federal acted negligently and assumed an unreasonable risk by failing to follow its policy of insisting on a certified or cashier's check and depositing the check promptly when received.

---

asserted breach of contract and conversion as well. While Family Federal did not move to amend its pleadings to assert these additional grounds, the court finds that the issues were

implicitly tried by the parties. Accordingly, the court treats these issues as if they had been raised in the pleadings pursuant to F.R.Civ.P. 15(b).

This conclusion is reinforced by Messner's knowledge of Rae's poor reputation in the financial community, which knowledge kept him from interviewing for a job with Rae. Further, Messner testified that as the transaction progressed, his opinion of Rae worsened. Messner testified that Rae had been holding out that there would be sufficient funds at the settlement table and it was not until the settlement date that Family Federal learned otherwise. Moreover, Manning informed Messner after the May 9 closing that he quit working for Radford and Messner should contact Rae regarding the corrected documents. Messner admitted there were several risks involved in the transaction, one of which was that the check might bounce. Based on these facts, the court finds that Family Federal voluntarily assumed the risk that the check would not be honored, and was unreasonable in doing so.

█ In testifying that Family Federal acted reasonably in holding the check until the corrected documents were forwarded by Radford Financial, Family Federal's expert witness did not consider Family Federal's suspicions regarding the source of the check. When presented with Messner's reasons to be suspicious of Rae, that the check was not drawn on an escrow account, and that Manning informed Messner that he had nothing more to do with the transaction, Family Federal's expert admitted that he would have had some concerns with holding the check and that it might have been prudent to put the check through.

Under D.C.Code § 28:3–503(2)(a), it is presumed that 30 days is a reasonable time in which to present an uncertified check for payment. Family Federal argues that it presented the check within a reasonable time under D.C.Code § 28:3–503(2)(a) because it presented the check for collection approximately two weeks after it received the $13,-601.61 second deed of trust. Family Federal argues that the court should not consider the period of time between Family Federal's receipt of the check, and July 1 or 2, 1983, when the second deed of trust was received, in determining whether Family Federal took an unreasonable amount of time to present the check for collection.

Family Federal may have been justified in waiting a short period of time to allow Radford to correct the deed of trust. Radford mailed the check and the assignment of the incorrect second deed of trust on May 20. Messner testified that he gave Rae seven days in order to correct the deed of trust. However, he let over a month pass without taking any action. There were sufficient funds in the account to pay the check until June 23, 1983, but the check was not deposited until July 18, 1983.

District of Columbia law requires a plaintiff to do all that is reasonably within its power to mitigate damages; the plaintiff's failure to avoid damages by doing what an ordinary and prudent person would do renders those damages the result of its own negligence and not the direct or natural consequence of the defendant's wrong. *Parking Management Inc. v. Jacobson*, 257 A.2d 479, 481 (D.C.App.1969). Thus, Family Federal had a duty to act as would an ordinary and prudent person to avoid damages. When the corrected deed of trust was not sent to Family Federal within the seven days, Family Federal was no longer justified in holding a check drawn of a general account from a corporation controlled by someone whose integrity it had several reasons to doubt. Accordingly, the court concludes that Family Federal's negligence, assumption of risk, and failure to mitigate damages bar its recovery from Manning in tort.

█ Even if Family Federal's claim against Manning for breach of fiduciary duty sounds in contract, Family Federal nevertheless had a duty to mitigate damages. *American Mortgage Inv. Co. v. Hardin–Stockton Corp.*, 671 S.W.2d at 291 (Mo.App.1984). Whether an injured party's claim sounds in tort or in contract, that party has a duty to mitigate damages after the wrongful action has occurred. This rule, referred to by some courts as the doctrine of "avoidable consequences," is applied in both tort and contract actions. *Dupre v. Tri–Parish Flying Service, Inc.*, 355 So.2d 554 (La.App. 3 Cir.1978). The doctrine is aptly explained as follows:

The doctrine of avoidable consequences is simply one of good faith and fair dealing.

The injured person need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize damages; reasonable diligence and ordinary care are all that is required to allow full recovery of all damages caused by the defendant's wrongful activity. More completely stated, the consequences of an injury are recoverable where the injured party acts with such care and diligence as a person of ordinary prudence would under the circumstances, and his efforts to minimize damages are determined by the rules of common sense, good faith, and fair dealing.

22 Am.Jur.2d *Damages* § 498 (1988). Although not characterized as such, the doctrine of avoidable consequences was applied by the U.S. District Court for the District of Columbia in *Tatum v. Morton*, 386 F.Supp. 1308, 1311 (D.D.C.1974), where the court stated as follows:

Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages. A corollary of the general rule is that a party cannot recover damages flowing from consequences which that party could reasonably have avoided. The obvious reason for this is that the community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted. This is especially true if the injured party can protect himself against additional adverse consequences at a trifling expense. [citations and internal quotation marks omitted.]

However, the court also recognized that one need not sacrifice or compromise a substantial contract or property right in order to mitigate damages. Family Federal argues that cashing the check would have compromised its legal position with respect to collecting the full balance due on the 1981 Note. Family Federal claims that had it cashed the check, Frankie Davis and National Mortgage could each have claimed that it was required to release the deed of trust securing the 1981 Note even though that note had not been repaid in full. At trial it was suggested to

Messner that Family Federal could have responded to such a claim by subordinating the deed of trust for the remainder of the 1981 Note rather than releasing it. However, Family Federal argues that this would not have put it in the position for which it bargained because Family Federal bargained for a second mortgage loan from Frankie Davis, who was not insolvent, rather than from William and Patrice Davis, the obligors on the 1981 Note, who were insolvent.

While the court agrees that Family Federal was not entitled to cash the check and record its foreclosure deed, nothing prevented it from sending the check back and recording the foreclosure deed, thereby notifying the Davises and National Mortgage that Radford Financial had the loan proceeds in its possession. It is clear from Messner's testimony, however, that Family Federal did not want the property; it wanted the loan paid by refinancing or sale of the property. To this end, Family Federal was willing to deal with someone Messner admitted he had reason to be careful with, and to engage in a transaction Messner admitted involved several risks. Yet Family Federal did not act with the care that would be used by a reasonable person in such circumstances.

Believing that the $7,400 balance was at risk, Family Federal put the other parties at risk for $45,641.70. At a minimum, Family Federal should have followed its own policies and secured the funds by insisting on a cashier's check from Radford Financial. Such action would not have compromised Family Federal's legal position with respect to the balance due on the 1981 Note, and would have prevented Radford from spending the funds. Thus, the court concludes that Family Federal's argument does not justify its failure to mitigate damages.

■ As to Family Federal's claim against Manning for conversion, Family Federal is correct that contributory negligence and assumption of risk are not defenses to the intentional tort of conversion. However, the evidence does not support a finding that Manning unlawfully exercised ownership or control over property belonging to Family Federal. Manning received from National Mortgage a check payable to him in the

amount of $73,643.63. Of this amount, $45,-641.70 was to be paid to Family Federal according to the settlement instructions. While the court finds that Manning was negligent in not ensuring proper disbursement of the funds, Manning did not convert funds belonging to Family Federal by endorsing the check over to Radford Financial. It was Rae who intentionally converted the funds; Manning had no knowledge that Rae would not safeguard the funds. Thus, a claim for conversion would be proper against Radford and Rae, but not against Manning.

### B. *Punitive Damage Claim*

Family Federal also seeks punitive damages against Manning. The court does not find that such an award is warranted.

> Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury. Whether punitive damages will lie depends on the intent with which the wrong was done, and not on the extent of the actual damages. Because direct proof will rarely be available, the finder of fact may infer the requisite mental state from all facts and circumstances surrounding the case.

*Washington Medical Center, Inc. v. Holle*, 573 A.2d 1269 (D.C.App.1990) (citations and quotation marks omitted). While Manning was negligent in turning over the loan proceeds to Radford Financial, the court does not find that his conduct was accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, or willful disregard of Family Federal's rights. There is no evidence that at the time Manning endorsed the check to Radford Financial, he knew or had reason to know that Radford would convert the loan proceeds to its own use. In fact, Radford issued a check to Family Federal and there were sufficient funds to cover the check at the time Family Federal received it. Furthermore, Manning told Messner to talk to Rae regarding the Second Trust Loan, and Family Federal dealt with Rae, not Manning, after receiving the check. Manning left Family Federal in a position to protect its own interests in its dealings with Radford. Thus, Manning was not reckless with respect to Family Federal's rights, and as to Family Federal, Manning's conduct does not warrant the imposition of punitive damages.

### C. *Contribution Claim*

While Family Federal is not entitled to a compensatory or punitive damage claim against Manning, the evidence clearly establishes that Manning's breach of his fiduciary duties, in releasing the loan proceeds to Radford Financial, is at the root of this entire case. If recovery were not available to the Davises and to National Mortgage from Family Federal, they would clearly recover against Manning. Accordingly, it would be unjust to hold Family Federal liable for the losses without recognizing the culpability of Manning, and holding Manning equally responsible for those losses, by way of contribution. *See Knell v. Feltman*, 174 F.2d 662 (D.C.Cir.1949) ("when a tort is committed by the concurrent negligence of two or more persons who are not intentional wrongdoers, contribution should be enforced"). Accordingly, Family Federal is entitled to a judgment against Manning for contribution in the amount of one-half of the funds lost through Manning's failure to properly account for the loan proceeds and Family Federal's negligent handling of the check. That amount is $22,820.85, plus prejudgment interest at the interest rate charged on the National Mortgage loan, plus any postjudgment interest. Manning may not set off against this any credit for the punitive damages assessed against him in favor of the Davises nor is Manning entitled to contribution against Family Federal on account of those punitive damages, because contribution is not appropriate for punitive damages. Moreover, any recovery by Family Federal on account of its contribution claim against Manning shall be subordinated to the punitive damage award to the Davises.

## II. FAMILY FEDERAL'S CLAIM FOR DECLARATORY RELIEF

Family Federal's Amended Complaint seeks an Order: 1) ratifying the transfer of property by William and Patrice Davis to

Frankie Davis; 2) declaring the Family Federal deed of trust in the principal amount of $40,000 to be a valid lien in full force and effect on the property, including interest and penalties, and prior to the deed of trust in favor of National Mortgage; 3) declaring the priority of the loss suffered as between the Defendants; 4) or, in the alternative, declaring the foreclosure deed of Family Federal to be valid and vesting title in Family Federal free and clear of all liens and encumbrances.

The defenses raised against this claim by the Davises and National Mortgage include (1) election of remedies; (2) equitable estoppel; (3) laches; (4) waiver; and (5) that Family Federal breached its duties to the defendants. Because Family Federal breached the duty of care it owed to the Davises (and to National Mortgage), the court rules against Family Federal on its claim for equitable relief.[7]

### A. *Family Federal's Breach of Duty to the Davises*

Family Federal owed a duty to the Davises to act in a reasonable fashion regarding their efforts to sell or refinance the property. This duty arose (1) by necessary implication from the Consent Order pursuant to which all of the parties were proceeding, (2) from the contractual relationship between the parties arising from the 1981 Note, and (3) as the ordinary tort duty that every person owes not to impose foreseeable harm on others by negligent acts. Family Federal's negligence in holding the Radford check for so long directly caused the losses suffered by all the parties. The negligence was both a tortious breach of Family Federal's duty of reasonable care, and was a contractual breach of Family Federal's obligations to perform its obligations under the Consent Order and the 1981 Note and deed of trust. If Family Federal were given the relief it seeks, whether title to the property or rein-

statement of the 1981 Note, Family Federal would succeed in placing on the Davises the loss caused by its own breach. Accordingly, the court finds that Family Federal's breach of its duty of care owed to the Davises provides a meritorious defense to Family Federal's prayer for relief against the Davises and the property.

### B. *Family Federal's Breach of Duty to National Mortgage*

National Mortgage would benefit incidentally from the finding that Family Federal breached its duty to the Davises, because the denial of relief against the Davises necessarily protects National Mortgage. Even apart from this, however, the court believes that National Mortgage would be entitled to prevail over Family Federal's request for relief against the property. Family Federal was aware that National Mortgage was advancing funds to Frankie Davis based on a settlement sheet that prohibited secondary liens. Family Federal intended to take National Mortgage's loan to repay the 1981 Note in part while retaining a junior lien in violation of National Mortgage's expectations and requirements. Moreover, when Family Federal received the check from Radford Financial, it became aware that the transaction had not been consummated as planned and that the loan proceeds were being held by Radford Financial in its general operating account, in violation of the settlement instructions. Yet it never informed National Mortgage of these facts. Accordingly, Family Federal violated its obligations of good faith and fair dealing towards National Mortgage, which provides an independent basis for denying Family Federal the equitable relief that it seeks.

### III. CLAIMS AND COUNTERCLAIMS AMONG FAMILY FEDERAL AND WILLIAM AND PATRICE DAVIS

Family Federal seeks a judgment against William and Patrice Davis in the amount of

---

7. As Family Federal's negligence precludes the relief it seeks, it is unnecessary to address the defenses of election of remedies, equitable estoppel, waiver and laches. Nonetheless, without engaging in an extended analysis, it appears that there is merit to the contention that Family Federal's actions amounted to a waiver of its right to record the foreclosure deed, and that Family

Federal ought to be equitably estopped from attempting to advance its lien position over that of National Mortgage and from denying that it received payment of $45,641.70 from Frankie Davis. The court is somewhat more doubtful about the merits of the election of remedies and laches defenses.

$45,641.70 plus accrued interest, costs and attorneys fees on the grounds that the 1981 Note was never fully repaid. William and Patrice Davis counterclaim against Family Federal for negligence, misrepresentation, and fraud. The Davises assert that Family Federal was acting in concert and collusion with Rae and Radford in holding the check. Further, the Davises claim Family Federal had a duty to present the check for payment in a timely manner and failed to exercise the degree of care required. The Davises argue that such actions violated Uniform Commercial Code ("UCC") provisions requiring timely presentment of drafts. As discussed below, the court finds the UCC argument unpersuasive.

However, for reasons developed in parts I and II of this Discussion, the court holds that Family Federal breached its obligations to William and Patrice Davis under the 1981 loan and the Consent Order, and that they are entitled to compensatory damages equal to the $45,641.70 check to be applied as a credit on the 1981 Note. Moreover, as set forth in part IV, the 1981 Note was usurious, and as a result all interest payments on that loan must be credited to principal. Accordingly, William and Patrice Davis have no further liability on the 1981 Note.

To the extent the credits to the 1981 note result in an overpayment on the 1981 Note, the court finds it proper to award to Frankie Davis, as compensatory damages, the return of the excess payment with interest thereon from the date Family Federal received the check until the date of judgment at the rate of interest being charged on the National Mortgage first deed of trust, plus post-judgment interest at the legal rate as set forth in 28 U.S.C. § 1961(a), to be determined on the date judgment is entered. The rationale is that if the loan had been properly calculated, Frankie Davis would have borrowed less from National Mortgage in order to repay the 1981 Note, and would have been spared interest on that amount at the rate of the National Mortgage loan.

The court rejects the Davises's arguments regarding violations of article 3 of the UCC, concerning presentment of checks. The court is not aware of, nor have the Davises cited, any provision of the UCC, or other authority, which imposes upon Family Federal a duty to cash the check within a reasonable time which gives rise to a claim for negligence by the Davises. Under D.C.Code § 28:3–502 (its UCC § 3–502), an unexcused delay in the presentment of an instrument results in the discharge of any indorser, and any drawer only if the drawee bank becomes insolvent during the delay. In this case, the drawee bank did not become insolvent while Family Federal held the check, and therefore its delay in presenting the check did not result in the discharge of Radford Financial, the drawer.

Further, Family Federal's acceptance of the check from Radford did not constitute a discharge of the underlying obligation. When an instrument payable on demand is taken for an underlying obligation, the obligation is suspended pro tanto until its presentment; and, if the instrument is dishonored, an action may be maintained on either the instrument or the obligation. D.C.Code § 28:3–802(1)(b) (its UCC § 3–802(1)(b)). *See also, Congress Industries, Inc. v. Federal Life Insurance Co. (Mutual),* 114 Ariz. 361, 560 P.2d 1268 (Ct.App.1977) (construing identical UCC provision, issuance and acceptance of an ordinary check is only provisional satisfaction of a debt, and the obligation is not fully satisfied until payment on the check is made). The court also dismisses the Davises' counterclaim for misrepresentation and fraud by Family Federal, finding no evidence that Family Federal acted in concert and collusion with Rae and Radford in holding the check.[8]

## IV. COUNTERCLAIMS BY FRANKIE DAVIS AGAINST FAMILY FEDERAL

Frankie Davis asserts the following counterclaims against Family Federal: 1) negli-

---

**8.** William and Patrice Davis also asserted cross-claims against Rae, Radford Financial, Manning, Mary Ann Comos, First American Title, John Blair and National Mortgage. However, the Davises have not pursued these claims and did not put on a case at trial. Accordingly, the court dismisses these cross-claims.

gence and breach of contract; 2) misrepresentation and fraud; 3) statutory usury; 4) violations of the Federal Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.;* 5) violations of the District of Columbia's Truth-in-Lending Act, D.C.Code § 28–3312; 6) Unlawful Trade Practices under D.C.Code § 28–3905; 7) Unconscionability and Overreaching; and 8) violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*

### A. *Negligence and Breach of Contract*

Frankie Davis argues that Family Federal was negligent in holding the check for almost two months. As was stated with respect to the counterclaim filed by William and Patrice Davis, the court is not aware, nor has Frankie Davis cited, any provision of the Uniform Commercial Code which imposes upon Family Federal a duty to cash the check within a reasonable time which gives rise to a claim for negligence. However, the basis for Frankie Davis's argument that Family Federal owed her a duty of care is that Family Federal knew that the loan from National Mortgage was made to her and that she was the party responsible for repaying that loan. Thus, Frankie Davis appears to be arguing that she was a third-party beneficiary to the agreement by Family Federal to accept payment in the amount of $45,641.70 in loan proceeds in partial satisfaction of the deed of trust securing the 1981 Note, to allow National Mortgage a first deed of trust against the property, and to take back a second deed of trust to secure the remainder due on the 1981 Note. The court agrees.[9]

■■■ One who is not a party to a contract nonetheless may sue to enforce its provisions if the contracting parties intend the third party to benefit directly thereunder. *Western Union Telegraph Co. v. Massman Constr. Co.,* 402 A.2d 1275, 1277 (D.C.App. 1979). Frankie Davis was not a party to the 1981 Note or to the Consent Order pursuant to which Family Federal agreed not to record its foreclosure deed. However, as the long-term resident of the property and the

party under the threat of losing her home, Frankie Davis was the intended beneficiary of the agreement between William and Patrice Davis and Family Federal not to record the foreclosure deed and to allow Frankie Davis to purchase the property through the financial arrangements made by Rae. Accordingly, the court concludes that Frankie Davis has a cause of action against Family Federal for its role in the breach of that financial arrangement. *Cf. Smith v. First Nat'l Bank & Trust Co. of Sturgis,* 177 Mich. App. 264, 440 N.W.2d 915, 920 (1989) (purchasers were third-party beneficiaries of a collection and disbursement agreement between the vendors and the bank); *King v. First Nat'l Bank of Fairbanks,* 647 P.2d 596, 600–601 (Alaska 1982) (while the bank was not liable for breach of an escrow agreement because no escrow agreement had been entered into between the bank and the purchasers of real property, an issue of material fact existed as to whether the purchasers were third-party beneficiaries of the contract between the sellers and the bank).

The court also concludes that Family Federal owed the Davises, including Frankie Davis as third party beneficiary, a duty to exercise ordinary diligence in performing its obligations relating to the Consent Order and the sale/refinancing. In holding the check on Radford's general account until after Radford presented the modified documents evidencing the secondary financing, Family Federal violated this duty. Under the Consent Order, Family Federal should have cashed the check and released its deed of trust, or, not having timely received the proper documentation, taken appropriate actions to safeguard the loan proceeds that it knew were in the possession of Radford and Rae.

Once Family Federal received the $45,-641.70 check, it assumed duties similar to those of an escrow agent holding a check drawn on a third-party's checking account. Given Family Federal's knowledge of Rae's checkered reputation, that Manning quit working for Radford shortly after the May 9

---

**9.** William and Patrice Davis are entitled to a credit for the amount of the $45,641.70 check (plus interest thereon) and that credit relates to the lien on Frankie Davis's property. This dis-

cussion is included primarily to show that regardless of any potential bar to William and Patrice Davis obtaining a credit, nothing precludes such relief as to Frankie Davis.

closing, and that the check was drawn on a general account and was not a certified or cashier's check as required by Family Federal's own policies, Family Federal was negligent in holding the check. *Cf. Wade v. Lake County Title Co.*, 6 Cal.App.3d 824, 86 Cal. Rptr. 182 (Cal.App.1970) (an escrow agent, in the exercise of ordinary diligence, would not hold a check for months without checking to see whether the purchaser had sufficient funds on deposit, and without advising the vendors that the check had not been deposited).

Accordingly, Frankie Davis is entitled to judgment on her counterclaim. Compensatory damages will be assessed against Family Federal in the form of a $45,641.70 credit against the 1981 Note as of the date Family Federal received the check, with any excess of the credit over the principal balance owed on that date to be returned to Frankie Davis with prejudgment interest at the rate charged on the National Mortgage loan, and postjudgment interest in accordance with 28 U.S.C. § 1961(a).

### B. *Usury*
#### 1. *Frankie Davis Has Standing To Raise Usury*

During closing arguments, counsel for Family Federal stipulated that the interest rate charged on the 1981 Note was greater than that allowed by the usury statute, if applicable. However, Family Federal argues that Frankie Davis did not acquire William and Patrice Davis's usury claim because she purchased the property for the stipulated price of $84,000, intending to pay off the 1981 Note and mortgage.

The defense of usury cannot be made by a person not interested in the matter; it must be made by the party from whom usury has been exacted and cannot be made in a collateral proceeding. *Phillips v. Ogle*, 21 D.C. (Tuck. & Cl.) 199, 207 (D.C. 1892). However, a purchaser of the equity of redemption in real estate who is in privity of estate or contract with the mortgagor and grantor can plead usury. *Mollohan v. Masters*, 45 App.D.C. 414, 420 (D.C.Cir.1916), *cert. denied*, 242 U.S. 652, 37 S.Ct. 245, 61 L.Ed. 546 (1917). This is to be distinguished

from one who purchases property for a given amount and assumes indebtedness as part payment. *Id.* In the latter case, to permit the plea of usury to reduce the encumbrance would change the agreed purchase price and make a new contract for the parties. *Id.* As Family Federal argues, the issue is whether the grantor "intended to assign his usury claim to the grantee. The law will presume such an assignment when the grantor sells only an equity of redemption and intends for the grantee to step into the grantor's shoes with respect to a usury claim against the mortgagee." Reply To Defendant's Opposition To Plaintiff's Motion For Partial Summary Judgment, p. 3. The presumption arises because if the purchase is an arms-length transaction for a price fixed at the fair value of the entire property, then if the mortgage may be challenged, the seller would have insisted on receiving the benefit of that challenge and would have increased the amount it charged for its equity of redemption.

Although the first settlement statement reflects a purchase price of $84,000, the evidence shows that Frankie Davis did not agree to purchase the property for a fixed price reflecting the value of the property. No money changed hands at the settlement table even though the first settlement statement indicates that there was a deposit or earnest money of $4,200 and a gift letter from William and Patrice Davis to Frankie Davis in the amount of $7,231.57. It is clear from the parties' testimony that these figures were thrown together to make the deal work, and the price arrived at was derived to qualify for a mortgage from National Mortgage sufficient to pay off as much as possible of the Family Federal loan. The essence of this transaction was the refinancing of the 1981 Note, not a sale for a set price. Accordingly, the court finds that Frankie Davis was not contracting to purchase the property for a stipulated price, and that by allowing her to raise the defense of usury, she is not getting a reduction in an agreed purchase price.

Moreover, the central issue is whether the selling party intended to assign his or her

usury claim to the purchaser, or if it would violate the seller's intent and understanding for the purchaser to reduce the price by challenging the mortgage debt. The structure of the sale (sale of the whole estate versus sale of the equity of redemption) is relevant only as a tool toward ascertaining that intent. Given the relationship between buyer and sellers in this case, it would defy reason to argue that the sellers did not intend to convey their rights to a usury claim to the buyer. The court concludes that Frankie Davis is entitled to raise usury as a defense to the 1981 Note.

The court reaches this conclusion on two additional, independent bases, as well. The sale of the property by William and Patrice Davis to Frankie Davis was not a third-party, arms-length transaction. Rather, these are family members who were engaging in a common transaction out of a common interest—preserving Frankie Davis's home. Although Frankie Davis was not originally an obligor on the 1981 Note, Family Federal agreed to accept payment from her on account of that note. And although the 1981 Note was secured by a lien on property that belonged to William and Patrice Davis, that property was always Frankie Davis's home. All of the Davises shared a common goal and common interests with respect to the 1981 Note. Moreover, to pay the 1981 Note, all of the parties agreed to enter into a transaction the essence of which was that the ongoing liability for that note would be assumed by Frankie Davis, in part through a refinancing by a third party and in part through a second mortgage note to Family Federal. On these facts, Frankie Davis was a real party in interest, and was in privity with both the original borrowers and the lender, and accordingly has standing to raise the issue of usury with respect to that loan.

Finally, D.C.Code § 28–3304 provides that the person that *pays* usurious interest may bring an action for its return. Family Federal seeks to collect the usurious loan from proceeds of a loan to Frankie Davis or from property now owned by Frankie Davis. Accordingly, Frankie Davis has standing under § 28–3304 to challenge the loan as usurious.

### 2. *The Usury Claim Is Not Barred By Res Judicata*

Family Federal also argues that the Davises no longer had any usury claim to assign at the time of the sale of the property because any such claim is barred by *res judicata* under the Consent Order. The court rejects this argument.

Frankie Davis was not a party to the Consent Order or the bankruptcy proceeding in which it was entered, but it is still possible that she can be bound by its terms as the privy of a party. However, assuming (without deciding) that Frankie Davis was bound by the Consent Order and that Family Federal is correct in arguing that William and Patrice Davis are the real parties in interest, the court concludes that the Consent Order does not preclude either Frankie Davis or William and Patrice Davis from raising the defense of usury.

In *In re Bishop,* 79 B.R. 94 (Bankr.D.D.C. 1987), the debtors entered into a loan agreement with Nationwide Mortgage Corp. ("Nationwide") that was admitted to be usurious for purposes of the summary judgment motion in the bankruptcy court. The loan was subsequently sold to Family Federal, which instituted foreclosure proceedings upon the debtor's default on the balloon payment of principal. *Id.* at 95. The debtors filed a complaint in D.C. Superior Court against Nationwide and Family Federal seeking to enjoin foreclosure because of, *inter alia,* usury and fraud. After commencing suit, the debtors entered into a "Loan & Trust Modification Agreement and Estoppel Certificate" (the "Settlement") whereby the parties dropped their respective proceedings and stipulated to the amount then due, which included the full amount of principal plus interest and charges on the original note without any deduction on account of the claimed usury. The parties filed a praecipe in the D.C. Superior Court requesting that the case be marked "settled and dismissed, with prejudice, as to all claims among and between the parties, and pursuant to the terms and conditions of the" Settlement. The debtors' case was then dismissed with prejudice. *Bishop,* 79 B.R. at 95.

Almost two years later, the debtors in *Bishop* filed their Chapter 13 petition, and subsequently filed an adversary proceeding seeking, *inter alia*, to disallow Family Federal's claim for interest and other charges and to credit all their interest payments against principal. Family Federal filed a motion for summary judgment on the ground that the debtors' suit was barred by the parties' 1983 settlement of the debtors' lawsuit claiming that the 1981 Note was usurious and tainted by fraud. The bankruptcy court rejected Family Federal's argument, finding the decisions of *Bowen v. Mount Vernon Sav. Bank*, 105 F.2d 796, 800 (D.C.Cir.1939), and *Indian Lake Estates, Inc. v. Lichtman*, 311 F.2d 776 (D.C.Cir.1962) to be dispositive. The bankruptcy court quoted from *Bowen* as follows:

> "... the renewal of an originally usurious note validates the transaction if all elements which made it usurious are eliminated. But if the lender retains money received as usury, the usurious element is not eliminated; and therefore the defense of usury may be set up against the renewal contract. There is no reason why the maker's knowledge of the usury, which did not validate the original contract, should validate the renewal. The usury law protects the maker in spite of knowledge. The same financial pressure which forced him to submit to usury in the first place may force him to renew. To permit a mere renewal or extension of the contract to purge usury would defeat the purpose of the statute. * * *" [footnote omitted].

In *Indian Lake Estates*, the court reversed a grant of summary judgment on facts essentially identical to those in *Bishop*, stating as follows:

> "In essence the complaint presents claims that the parties entered into agreements, purporting to settle and compromise pre-existing contracts which, it is claimed,

were both illegal and void because of violation of usury statutes ...

> \* \* \* \* \* \*

> "If the original contracts and engagements were illegal and void, as the court assumed for purposes of appellees' motion, the claims of the complaint present complex issues of fact and law as well as some which are mixed questions of law and fact, which were not susceptible of disposition by summary judgement."

*Indian Lake Estates*, 311 F.2d at 777.

Here, there was no elimination of the usurious taint of the 1981 Note. After the Consent Order was signed, Family Federal continued to seek full payment of the 1981 Note, including all interest, either from William and Patrice Davis or from Frankie Davis.[10]

Even if parties could legally waive the defense of usury without eliminating its taint from the transaction, the court finds that the Consent Order would not constitute such a waiver. Although William Davis consulted with an attorney before signing the Consent Order, he testified that he did not believe that he had any claims against Family Federal and accordingly believed that the waiver of claims language in the Consent Order was a moot point. Accordingly, that language was not a knowing or deliberate relinquishment of the usury defense. Further, it is not clear that the Davises could have raised the defense of usury in Family Federal's suit, which sought declaratory judgment and termination the automatic stay which was in effect due to the Georgia bankruptcy proceeding. *See, In re Jackson*, 42 B.R. 76, 82–83 (Bankr.D.D.C.1984) (order lifting the automatic stay did not bar the debtors' usury defense under the doctrine of *res judicata* or collateral estoppel, even though the debtors sought to raise the defense in the lift-stay proceeding, because matters appropriate for consideration in proceedings for relief from the stay are limited and nowhere in the

---

10. To make matters worse, in obtaining a second deed of trust in order to ensure full payment of the 1981 loan, Family Federal closed its eyes to what it knew to be exorbitant charges by Radford Financial. The Settlement Statement for the Second Trust Loan clearly indicates that Radford Financial was charging the Davises a finder's fee in the amount of $8,400.00, in addition to settlement costs in the amount of $200.00. Thus, rather than eliminating any illegal taint to the 1981 loan transaction, Family Federal condoned further unscrupulous activity by Rae and Radford Financial by going forward with the May 1983 transaction.

court's findings, conclusions, and order lifting the stay was there any mention of the debtors' usury defense.)

Moreover, Family Federal itself did not abide by the terms of the Consent Order. According to the Consent Order, Family Federal was to have recorded its foreclosure deed if the Davises were unable to refinance or sell the property within 30 days. Family Federal did not record its foreclosure deed even though the Davises were unable to come up with a purchaser who could pay off Family Federal in full within the stipulated period. Instead, Family Federal chose to pursue collection of the usurious 1981 Note by obtaining an additional source of payment, that being Frankie Davis, rather than exercising its rights against the property. In so doing, Family Federal was negligent in a manner that harmed the Davises and National Mortgage. Thus, the court concludes that Family Federal cannot use the Consent Order as a shield against defenses on the 1981 Note, because Family Federal chose to disregard the terms of the Consent Order in order to pursue full collection of the usurious note, damaging the defendants in the process.

This case is distinguishable from *Williams v. Gerstenfeld*, 514 A.2d 1172 (D.C.App.1986), because (1) Family Federal did not abide by the terms of the Consent Order and instead obtained a second source of payment of the usurious loan, and (2) there is no evidence that William and Patrice Davis knowingly waived the defense of usury. In *Williams,* the debtor filed a petition under Chapter 13 the day before Gerstenfeld scheduled a foreclosure sale to enforce a second deed of trust against the debtor's residence. Gerstenfeld filed a complaint to modify the stay, and the debtor answered that he expected refinancing and the bankruptcy court should not permit foreclosure while his contentions that the loan was unconscionable remained unresolved. *Id.* at 1174. Prior to the hearing on the complaint, the parties reached an agreement and the bankruptcy judge issued a consent order providing that if the entire balance due on the note was not paid by May 1, 1981, the automatic stay would terminate

and Gerstenfeld would be allowed to foreclose. On April 29, 1981, the bankruptcy proceeding was dismissed pursuant to the debtor's motion for voluntary dismissal without prejudice.

The next day, the debtor filed an action in the Superior Court seeking to enjoin foreclosure or other enforcement of the promissory note and deed of trust, and money damages for violation of, *inter alia,* District of Columbia usury laws. Gerstenfeld then filed a motion in the bankruptcy court for reconsideration of the dismissal of the Chapter 13 proceeding or entry of a protective order. On May 1, 1981, the bankruptcy court issued an order that the debtor was precluded from seeking injunctive relief to stop foreclosure as a condition of the dismissal of the Chapter 13 proceedings. On the same date, the Superior Court granted a temporary restraining order, but subsequently denied a preliminary injunction on the ground that the debtor's claims were barred by *res judicata* as a result of the bankruptcy proceedings. This denial was without prejudice to renewal if the bankruptcy court's May 1 order was reversed on appeal.

In holding that the consent order barred the debtor's claims under the doctrine of *res judicata,* the D.C. Court of Appeals found that both parties submitted pleadings to the bankruptcy court, the court scheduled a hearing and trial, and eventually ordered the debtor to pay the entire debt or face foreclosure. *Williams v. Gerstenfeld,* 514 A.2d at 1179. Thus, the appellate court concluded that the issue of the debtor's indebtedness had been submitted to the bankruptcy court for determination and could have been litigated by proceeding to a hearing on Gerstenfeld's complaint to modify the stay, and to trial. The appellate court noted that this was apparent from the fact that the debtor had raised the defense of unconscionability in his answer to Gerstenfeld's complaint and that he disputed the debt in a statement accompanying the proposed Chapter 13 plan. Further, the appellate court noted that the bankruptcy court's May 1 order recited the preclusive effect of the dismissal.[11] Thus,

---

11. It should also be noted, in contrast to Family Federal's actions in this case, the lender in

*Williams* enforced it rights under the consent

the appellate court appears to have viewed the question of *res judicata* effect to have already been resolved by the bankruptcy judge's May 1 order. The appellate court failed to note the possibility that damage relief was not precluded by the bankruptcy judge's order and that the May 1 order only addressed the preclusive effect of the Consent Order as to seeking injunctive relief. The appellate court failed to take cognizance of the bankruptcy court's earlier decision in *Jackson* holding that lift stay proceedings address only limited issues.

None of the crucial findings in *Williams v. Gerstenfeld* can be made as to William and Patrice Davis or as to the entry of the Consent Order signed by them. There is no evidence that William and Patrice Davis raised the usury defense in any pleadings filed prior to signing the Consent Order. To the contrary, William Davis was not aware of any claims that could be raised against Family Federal. Further, there is no evidence that the issue of William and Patrice Davis's indebtedness was ever submitted to this bankruptcy court for determination. Finally, there was no subsequent order by the bankruptcy court decreeing that its prior court order had preclusive effect. *Williams v. Gerstenfeld* is therefore not persuasive authority in the present case, and the court concludes that Frankie Davis is not barred by the Consent Order from asserting the defense of usury.

### 3. *The 1981 Loan Was Not A Business Loan*

██ Family Federal next argues that the 1981 Note to William and Patrice Davis is exempt from the usury statutes under D.C.Code § 28–3301(d), which provides as follows:

Notwithstanding any other provision of this chapter any loan having an original principal amount in excess of $5,000.00 shall not be subject to the provisions of this chapter, and it shall be lawful to contract for, or receive, any rate of interest thereon, if any of the following conditions are satisfied:

     \*     \*     \*     \*     \*     \*

(2) the borrower is an individual, ... and the loan is made for the purpose of acquiring or carrying on a business, professional or commercial activity; or

(3) the borrower is an individual, ... and the loan is made for the purpose of acquiring any real or personal property as an investment or for carrying on an investment activity; ...

The bankruptcy court in *Jackson*, 42 B.R. at 77–81, construed these exceptions to the usury statute and rejected arguments similar to those made by Family Federal in this case. In *Jackson*, the debtors obtained a loan from Security Finance Group, Inc. ("SFG") which was secured by two residences, one of which was occupied by the debtors' parents and one of their sons, and the other of which was occupied by the debtors themselves and a number of their children. *Jackson*, 42 B.R. at 77–78. The court found that the purpose of the SFG loan was to pay off prior business-purpose loans made by others and to stave off foreclosure against the residences. *Id* at 79. The court also found that when SFG made the loan, the debtors were no longer "carrying on" any business or commercial activity, nor did they intend to use any of the loan proceeds in order to "acquire" any business; and SFG knew these facts. *Id.* at 81. Further, the court found that SFG knew that neither of the properties were then investment properties, but rather they were the debtors' and their family's residences.

SFG argued that the investment-activity exception applied to the property occupied by the debtors' parents because at a later date the debtors entered into formal leasing agreements for the payment of rent to them by their kin. However, the court found that no such formal lease or rental-payment agreement existed when SFG made its loan, and that in fact no regular monthly amounts were paid to the debtors by their kin for occupancy of those premises at that time. Rather, the court found that as to that residence, the debtors' purpose in obtaining the SFG loan was to provide continued living accommodations for their kin, and that they

order by holding a foreclosure sale and purchas-

ing the debtor's residence. *Id.* at 1175.

wanted to keep that property for that purpose, not in order to derive income from or appreciation in value of that property. *In re Jackson*, 42 B.R. at 81. Accordingly, the bankruptcy court concluded that the debtors' purpose as to that property was not related to "carrying on" any "investment activity" or to "acquiring" any "investment property."

Further, the court rejected SFG's defense that the debtors were estopped from benefitting from their own misrepresentations, referring to the debtors' representations on their loan application and their hand-written affidavit which stated that the purpose of the loan was to refinance existing business loans. *Id.* at 81–82. Noting that the D.C. City Council recently enacted legislation which, *inter alia*, prohibits lenders from requiring borrowers to sign a false business-purpose affidavit or statement, and provides criminal penalties if lenders do so, the court stated as follows:

> Since the usury law was passed for the protection of borrowers, a lender should not be permitted to evade that law by requiring borrowers to sign affidavits as a condition for obtaining any loan, then failing to conduct a reasonable and thorough investigation of its own concerning the truthfulness of the matters asserted in the affidavits, and then claiming detrimental reliance. The balance of wrongdoing tilts heavily against the lender in such a case.

*Jackson*, 42 B.R. at 83. The court stated that even if there were factual misrepresentations and SFG had detrimentally relied thereon, it would still rule against SFG unless SFG also proved that it had conducted a reasonable and thorough investigation of its own. *Id.*

In this case, William Davis signed a written statement that the 1981 loan proceeds were to be used for investment purposes, and had also indicated on his loan application that he was receiving rent from his mother, Frankie Davis, in the amount of $4,800.00. However, he was told by the people making the loan that he needed to make this statement in order to obtain the loan; his personal financial statement is inaccurate because he in fact was not receiving rental payments from his mother. Further, the people mak-

ing the loan knew that Frankie Davis was living in the house and paying the first mortgage and the other expenses on the property. Approximately one-half of the loan proceeds were used by William Davis to pay off personal bills, with the other half going to pay off liens against the property.

The property was not being held by William Davis as investment property. The property was put in his name as the result of his parents' divorce, and his mother continued to occupy the property as her only residence. Frankie Davis paid all of the bills relating to the maintenance of the property, including payments on a first mortgage against the property, and did not pay her son any rent. There is no evidence that William Davis was holding the property in order to derive income from or appreciation in the value of the property. Rather, the court finds that the property was Frankie Davis's residence, and that the payment of liens against the property by William Davis was to ensure that his mother would not lose her home to foreclosure. Thus, the court concludes that the 1981 Note was not related to "carrying on" any "investment activity" or to "acquiring" any "investment property" and does not fall within these exceptions to the usury statute.

### 4. *Treatment of the Second Trust Loan*

Frankie Davis also alleges that the Second Trust Loan is usurious because it was executed on June 16, 1983, at a rate in excess of 15% per annum including various lending fees and monthly payments of interest, when the maximum legal rate of interest in the District of Columbia was 15% per annum. Family Federal argues that the loan is not usurious because the interest rate does not exceed the 15% usury ceiling. However, because of the usury of the 1981 Note, the court finds that whether or not the Second Trust Loan was usurious is a moot question.

The Second Trust Note is comprised of the balance of the 1981 Note less the repayment made (or that would have been made had Family Federal not negligently permitted the check to be dishonored) from the National Mortgage loan. To the extent that the 1981 Loan was usurious and interest on that loan must be disallowed, no more than $40,000

(the principal amount) could have been owed on that loan. See D.C.Code § 28–3305 ("any payment of interest that may have been made on account of the [usurious] contract is deemed to be payment made on account of the principal debt"). As the Davises are entitled to a credit for the $45,641.70 lost through Family Federal's negligence, there can be no remaining balance on the $40,000 1981 Note.

■ Frankie Davis argues that the $8,400 finder's fee charged by Radford is usurious. The court rejects this argument. A broker's commission paid for obtaining a loan from a third person does not constitute usury. *Oliver v. United Mortgage Co.*, 230 A.2d 722, 724 (D.C.App.1967). However, the court finds that Radford has no right to collect the finder's fee because of its breach of contract in converting the loan proceeds.

Frankie Davis has made payments to Family Federal, under the Second Trust Note, on account of the $8,400 fee charged by Radford Financial, and Family Federal has retained those amounts rather than paying them over to Radford. If Frankie Davis were liable to Radford for these amounts, she would have no right to their return from Family Federal; the issue would be solely between Family Federal and Radford. However, because Radford has no enforceable claim to the finder's fee, any payment by Frankie Davis on account of that fee constitutes unjust enrichment to the recipient. Family Federal in particular has no right to these funds (that is, even if the finder's fee were enforceable, it was owed to Radford and not Family Federal), and would be unjustly enriched if it were permitted to keep them.

As there was no outstanding balance due on the 1981 Loan and the $8,400 finder's fee is unenforceable, the court finds that the Second Trust Note, which is comprised of these debts, is invalid and unenforceable.

### 5. *Conclusion*

Accordingly, the court will enter judgment against Family Federal and in favor of Frankie Davis, in the amount of (a) the total of all payments received by Family Federal on the Second Trust Note, plus interest from the date of each such payment through the date of judgment at the rate charged on the National Mortgage loan, plus postjudgment interest; plus (b) $45,641.70 less the unpaid principal balance on the 1981 Note on the date the $45,641.70 check was received by Family Federal, calculated in accordance with Section 28–3305 of the District of Columbia Code, plus interest thereon at from such date through the date of judgment at the rate charged on the National Mortgage loan, plus postjudgment interest. The Second Trust Note and the mortgage securing the Second Trust Note will be declared void and unenforceable. Moreover, in view of the court's determination that the 1981 Note, to the extent it embodied a valid and enforceable obligation, has been fully repaid, the 1981 deed of trust and the foreclosure deed held by Family Federal will be declared invalid and void and will be cancelled.

### C. *Truth-in-Lending Acts*

■ As to Frankie Davis's claim that Family Federal violated the Federal Truth-in-Lending Act, Family Federal concedes that with respect to the 1983 loan, it did not give Frankie Davis the disclosure statement required by the Act.[12] Accordingly, Frankie Davis is entitled to twice the amount of any finance charge in connection with the transaction, not to exceed $1,000, the costs of the action, and reasonable attorney's fees. 15 U.S.C. § 1640. The court therefore awards Frankie Davis $1,000, and will direct counsel for Frankie Davis to submit a bill of costs and attorney's fees incurred in pursuing this issue, and will give Family Federal an opportunity to respond.[13]

---

12. In her Amended Answer, Counterclaim and Cross–Claim, Frankie Davis alleges violations of the Federal Truth-in-Lending Act with respect to both the 1980 and the 1983 loans. However, post-trial, Frankie Davis limited her Truth-in-Lending argument to the 1983 loan, and Family Federal concedes this issue only with respect to the 1983 loan.

13. Frankie Davis also argues that she has the right of rescission. However, the court agrees with Family Federal that the 1983 loan falls within the exemption from the rescission rights provisions of the Federal Truth-in-Lending Act for residential mortgage transactions. *See*, 15 U.S.C. § 1635(e)(1)(A). Further, Frankie Davis offers no authority for her contention that Family

■ Frankie Davis also alleges that Family Federal violated the District of Columbia's Truth-in-Lending Act, citing D.C.Code § 28–3312. However, D.C.Code § 28–3312 was not enacted until March 14, 1984, and Frankie Davis cites to no authority for its retroactive application to transactions that took place before its enactment. Further, from the Post Trial Brief of Frankie Davis, DE 343, it appears that this claim is based upon the same alleged misrepresentations by Family Federal which form the basis of her claims under D.C.Code § 28–3904 and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(c). As stated below, the court finds these claims to be without merit.

### D. Unlawful Trade Practices

■ Frankie Davis alleges that Family Federal engaged in Unlawful Trade Practices as defined in D.C.Code § 28–3904 by accepting the $40,000 loan as successor in interest to Olsen and misrepresenting that the loan was a business loan, and by misrepresenting that the $13,601.61 Second Trust Loan was being used to satisfy a remaining debt to Family Federal as well as to pay additional interest charges associated with the closing on the National loan. However, at the time of the transactions in question, the Consumer Protection Procedures Act, Title 28 of the D.C.Code, did not apply to real estate transactions. *Owens v. Curtis*, 432 A.2d 737, 739 (D.C.App.1981).[14] Further, the court finds these claims without merit on the additional ground that there was no evidence of any representations made by Family Federal to Frankie Davis.

### E. Unconscionability and Overreaching

Unconscionability is defined as "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party," and the first party's lack of "a reasonable opportunity to understand the terms of the contract." *Greene v. Gibraltar*

Federal's failure to state that the loan was a purchase money loan on the settlement sheet precludes it from asserting this exemption.

*Mortgage Inv. Corp.*, 488 F.Supp. 177, 180 (D.D.C.1980) (quoting *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)).

■ Frankie Davis is not an uneducated person. She is a retired guidance counselor and testified that she had paid all of the bills relating to the residence. Further, she testified that she had questions regarding the settlement sheet and that answers were given to her. She kept a notebook which contained information regarding the settlement and it is clear from her notes that she had a basic understanding of the terms of the transaction. She also testified that she knew what a second trust is, but that she was not aware of all its ramifications. Nevertheless, she signed both the Settlement Statement for the Second Trust Loan, which indicates that Radford was to receive a "Finder's Fee" of $8,400, and the Irrevocable Assignment to Family Federal, which indicates that Family Federal was to receive only $7,430 of the proceeds of the $16,030 second trust loan payable to Radford Financial. Thus, the court finds that Frankie Davis knew Radford was attempting to collect a Finder's Fee of $8,400, and that she had a reasonable opportunity to understand the terms of the Second Trust Loan. Accordingly, the court concludes that the loan was not unconscionable.

### F. Real Estate Settlement Procedures Act

First, Frankie Davis claims that Family Federal violated 12 U.S.C. § 2607(c) and the accompanying regulation, 24 C.F.R. § 3500.-7(e), by failing to notify her that Rae was working for them in negotiating the Second Trust Loan. Second, Frankie Davis claims that Family Federal is responsible for the actions of their agent, Rae, who used this position to exert undue influence over her in requiring that she pay an exorbitant fee of $8,400. Frankie Davis also argues that Family Federal violated 12 U.S.C. § 2604(c), which requires that there be a good faith

14. On March 8, 1991, the Consumer Protection Procedures Act, Title 28 of the D.C.Code, was amended to make the sale or lease of real estate a consumer transaction. *See*, D.C.Law 8–234, § 2(b), 38 DCR 296.

estimate for settlement services, and 12 U.S.C. § 2607(b), which prohibits fee splitting except for services actually performed. Frankie Davis claims that because Family Federal did not provide her with a good faith estimate of what the settlement charges should have been, Rae was able to demand an exorbitant fee. Further, Frankie Davis states that Family Federal agreed to collect payments on the entire Second Trust Loan, which included charges in excess of services actually performed by Rae, and split the money with Rae. The court finds these claims without merit.

■ First, the Real Estate Settlement Procedures Act applies to "federally related mortgage loans," which are defined in part as any loans which are secured by a first lien on residential real property. 12 U.S.C. § 2602(1)(A). *See also,* 24 C.F.R. § 3500.-5(b)(2) ("Federally Related Mortgage Loan" means a loan secured by a "first lien or other first security interest covering real estate.") Family Federal's $13,601.60 loan was secured by a second deed of trust, not a first lien.

■ Further, the evidence does not support Frankie Davis's claim that Rae was working for Family Federal or acting as Family Federal's agent in making the Second Trust Loan. While the court finds that the $8,400 finder's fee Rae attempted to collect through Radford is exorbitant, there is no evidence that Family Federal determined the amount of the fee, that Radford agreed to split the fee with Family Federal, or that Family Federal intended to retain any portion of the fee. Thus, Frankie Davis's claim does not fall within the scope of 26 U.S.C. § 2607(b), which is intended to prohibit kickback and referral fee arrangements in the real estate settlement business. *See, Duggan v. Independent Mortgage Corp.,* 670 F.Supp. 652 (E.D.Va.1987).

However, the court is troubled by the testimony that Family Federal is in fact collecting the entire amount of the Second Trust Loan, including the $6,171.61 that was irrevocably assigned to Radford Financial. As stated above, any such amounts paid to Family Federal must be returned to Frankie Davis, with interest.

## V. FRANKIE DAVIS'S CROSS–CLAIMS

By her Amended Answer, Counterclaim and Cross–Claim, Frankie Davis asserts cross-claims against Rae, Radford Financial, Manning, National Mortgage, Bay State, Joanne Scarborough, Mary Ann Comos, Harold Messner, First American Bank, Olsen and John Blair. The cross-claims against Joanne Scarborough, Mary Ann Comos, Harold Messner, First American Bank, and Olsen will be dismissed as inappropriate under F.R.Civ.P. 13(g) because these parties were never named as defendants in the original action.[15] Also, Frankie Davis voluntarily dismissed her claim against John Blair under F.R.Civ.P. 41(a). See DE 274. Additionally, in a ruling from the bench at the close of Frankie Davis's case, the court dismissed her cross-claim against National Mortgage and Bay State under Rule 41(b), F.R.Civ.P., rejecting her theory that Radford and Manning were acting as agents for National Mortgage and that National Mortgage was put on notice that there were problems with the settlement. Accordingly, the only remaining cross-claims asserted by Frankie Davis are those filed against Rae, Radford and Manning.[16]

**15.** On January 18, 1985, Frankie Davis filed a motion seeking to redesignate Messner, Scarborough, First American Bank, Comos and Olsen as Third–Party Defendants. See DE 49. However, the motion was not ruled upon. On April 23, 1985, the court granted Frankie Davis' Motion for Leave to Amend Debtor's Answer, Counterclaim and Cross-claim. The Amended Answer, which was deemed filed as of April 23, 1985, listed these parties as cross-claimants. On March 16, 1987, Frankie Davis filed a motion for leave to file a second amended answer, counterclaim, cross-claim and third-party complaint, naming Messner, Scarborough, First American Bank, Comos, and Olsen as third-party defen-

dants. However, the court denied the motion finding that granting Frankie Davis' request would create undue burden on all parties involved and provide a further delay in the proceedings. As a result of the order denying Frankie Davis' motion for leave to file a second amended answer, the court finds that Frankie Davis' motion seeking redesignation of these parties as third-party defendants is moot.

**16.** Frankie Davis also asserts a claim against Family Federal, Joanne Scarborough, Harold Messner, and Rae for the intentional infliction of emotional distress. Frankie Davis did not pur-

### A. *Against Rae and Radford Financial*

Frankie Davis asserts claims against Rae and Radford on the grounds of misrepresentation and fraud; unconscionability; unlawful trade practices; violations of RESPA; conversion; negligence, breach of contract and breach of fiduciary duty—statutory and common law. As to the first count, Frankie Davis seeks compensatory damages against Rae and Radford in the total amount of $48,038.83, consisting of the converted $45,641.70 check, a payment in the amount of $1,187.62 from William Davis for the benefit of Frankie Davis, and a refund check in the amount of $1,209.51 forwarded to Radford by Cameron–Brown representing an escrow balance on the first mortgage against the property. Frankie Davis also seeks punitive damages in the amount of $500,000 and costs and attorney's fees. In addition to these amounts, Frankie Davis seeks the proceeds on the Second Trust Note under her claim of unconscionability.

For the alleged violations of D.C.Code § 28–3904 (unlawful trade practices), Frankie Davis seeks treble damages in the amount of $136,925.19 under D.C.Code § 28–3905, plus punitive damages in the amount of $100,000.00, costs, and attorney's fees. As noted above, D.C.Code § 3904 did not apply to real estate transactions at the time of the events under consideration, and so the court must reject this claim.

For the violations of RESPA, Frankie Davis seeks a judgment in the amount of $48,196.22 with costs and attorney's fees. As noted above, RESPA did not apply to the Second Trust Loan. However, to the extent that Frankie Davis is contending that Rae and Radford acted improperly with respect to their role as mortgage broker for the National Mortgage loan, RESPA does apply. But Frankie Davis has failed to articulate a violation of RESPA for which RESPA provides a damage remedy. Only 12 U.S.C. § 2607(d)(2) provides such a remedy and, then, only for violations of § 2607(a) or (b).

Those provisions do not apply, even though the $8,400 finders fee was exorbitant. *Duggan,* 670 F.Supp. at 652.

Neither Rae nor Radford filed a responsive pleading to the cross-claims, nor did anyone appear on their behalf to defend against these claims at trial. However, Rae was the debtor and received a discharge in a Chapter 7 bankruptcy case, and so it is possible that any claim against him was discharged. But there are exceptions to discharge, and Rae has not raised his discharge as a defense. The court thus will enter judgment against Rae without deciding whether this judgment is res judicata as to whether the judgment is unenforceable.

Judgment will be entered against Rae and Radford Financial in the amount of $48,038.83, plus prejudgment interest thereon at the rate charged on the National Mortgage loan, as compensatory damages, all trebled to accord punitive damages double the compensatory award. Judgment will also be entered holding that the $8,400 finder's fee charged by Radford Financial is void and unenforceable on account of Radford's breach of contract. The compensatory relief awarded to Frankie Davis against Rae and Radford Financial includes $45,641.70 for loan proceeds that they converted. This would result in a double recovery if Family Federal's claim remains extinguished, that is, if this decision is not reversed on appeal. Accordingly, the compensatory award against Rae and Radford shall be deemed satisfied on a dollar-for-dollar basis by Frankie Davis's "recovery" from Family Federal as to the $45,645.70 check (by way of a credit against Family Federal's lien claims).

### B. *Frankie Davis's Cross–Claims against Manning*

Frankie Davis filed cross-claims against Manning on the grounds of unlawful trade practices under D.C.Code § 28–3904, negligence, breach of contract, breach of fiduciary duty under statutory and common law, undue

sue this claim at trial, nor does she mention it in her post-trial filings. Accordingly, the court con-

influence, and overreaching.[17] Frankie Davis claims that Manning acted as the settlement attorney and that he breached his duty to her by failing to ensure the proper disbursement of the National Mortgage loan proceeds and the vesting of title in the proper parties. Manning argues that he was a part-time employee of Radford and functioned as an employee at the settlement. Further, Manning claims that the Davises looked to Radford as the settlement and escrow agent, and it was Radford that owed a fiduciary duty to the Davises.

The court rejects Manning's claim that Frankie Davis looked to Radford as the settlement agent for the May 9 settlement. Frankie Davis was informed that Manning is an attorney, and was introduced to him as the person who was going to take care of her in the settlement. Manning gave Frankie Davis a business card with his Alexandria office address, supervised the preparation of the settlement papers, and went over the papers with the Davises at the closing. Even after Manning resigned from Radford Financial, he undertook the completion of the closing by helping Frankie Davis obtain some records to show that certain judgments had been released. The personal notes made by Frankie Davis that were admitted into evidence indicate that she was dealing with "Attorney Manning" and depending upon him to complete the settlement. It was Manning, not Radford Financial, for whom an insured closing letter was issued by First American. Manning accepted the check and the settlement instructions from National Mortgage, which designated him as their agent, without informing any of the parties that he was not acting as the settlement attorney. There is no evidence that Manning ever informed the Davises, or anyone else, that he was acting as a part-time employee of Radford Financial. Manning cannot now escape responsibility for his actions by claiming that Radford was the settlement agent when he in fact had assumed that role.

By undertaking the duties of a settlement attorney and accepting the tenders of performance by the parties to the settlement, Manning was acting as an escrow agent. Accordingly, he owed a fiduciary duty to both the buyer, Frankie Davis, and the sellers, William and Patrice Davis. *See, Ferguson v. Caspar,* 359 A.2d at 2–21; *Wagman v. Lee,* 457 A.2d at 404. The court heard three experts testify as to the duties of a settlement agent. All of the experts agreed that a fiduciary cannot escape liability by turning over funds to another party, unless there is approval to turn over such funds. One expert testified and the court agrees that under no circumstances is it proper for a settlement attorney to turn money over to a third person and ask that person to assume the settlement attorney's responsibilities, except with everyone's consent and knowledge. Manning failed to inform the parties that he was entrusting the loan proceeds to Radford and that he did not intend to complete the settlement by ensuring that the proceeds were properly disbursed. Without such disclosures and the consent of all the parties, Manning cannot escape his responsibilities as the settlement attorney by claiming that he was merely a part-time employee of Radford Financial. The court finds that Manning breached his fiduciary obligations to the Davises by turning the loan proceeds over to Radford without the knowledge or consent of all the parties and by walking away from the transaction without ensuring that the funds were secure or that proper disbursements were made.[18]

Frankie Davis seeks punitive damages against Manning in the amount of $100,000. Manning claims that punitive damages are not warranted because his conduct was not willful or reckless. While the court found that Manning's actions as to Family Federal did not warrant an award of punitive dam-

cludes that this claim should be dismissed.

**17.** As stated above, D.C.Code § 28–3904 did not apply to real estate transactions at the time of the loan transactions at issue in this case.

**18.** The court finds that these actions also constitute a violation of D.C.Code § 45–1937, which requires that any person entrusted with monies in any real estate transaction must deposit such funds in a separate escrow account and retain such funds in the account until consummation of the transaction.

ages, the question is much closer with regard to his conduct towards Frankie Davis.

■ As stated above, punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury. *Washington Medical Center,* 573 A.2d at 1284. The court finds that Manning's conduct as to Frankie Davis was accompanied with recklessness and a willful disregard of her rights. Manning was introduced to Frankie Davis as the person who would take care of her in the settlement. Manning never informed her that he was not representing her interests in the settlement or that he was acting only as an employee of Radford Financial. Manning placed himself in a position of trust with Frankie Davis to assure that the funds he received were properly disbursed.

Further, Manning resigned from Radford after the May 9, 1983, closing, admitting that this transaction was a motivating factor for his resignation. Yet, Manning continued to give Frankie Davis the impression that he was looking out for her interests by helping her obtain records to show that certain judgments had been released. While helping Frankie Davis to clear the title to the property, Manning did nothing to ensure that the loan proceeds were secure or properly disbursed. Unlike Family Federal, Frankie Davis was not in a position to ensure that disbursements were properly made. The court finds Manning's entire course of conduct, including his continued participation in the settlement, even after his resignation from Radford Financial, without ensuring that the loan proceeds were secure or properly disbursed, shows a recklessness and a willful disregard for the rights of Frankie Davis. Thus, the court concludes that as to Frankie Davis, punitive damages are warranted, and an appropriate measure for those punitive damages is the reasonable costs and attorney's fees incurred by Frankie Davis in this adversary proceeding.

## VI. MANNING'S CROSS–CLAIMS

### A. *Against Rae and Radford Financial*

Manning filed a cross-claim against Rae and Radford seeking contribution toward or indemnification of any and all sums adjudged against him in favor of Family Federal or any cross-claimants, plus costs, attorneys fees, and pre- and post-judgment interest. Neither Rae nor Radford filed a responsive pleading to the cross-claim, nor did anyone appear on their behalf to defend against these claims at trial. Accordingly, judgment will be entered against Rae and Radford for indemnification of any sums paid by Manning to satisfy judgments entered against him.

### B. *Against William and Patrice Davis*

Manning asserts a cross-claim against William and Patrice Davis based on their failure to disclose to him the existence of their bankruptcy proceedings. First American Title caused a title search on the property to be performed on or about March 14, 1983. The title report sent to Manning gave no indication of the bankruptcy proceedings involving William and Patrice Davis. Manning was unaware of the bankruptcy proceeding when he conducted the settlement.

Manning claims that William and Patrice Davis had a duty to inform him that a foreclosure sale had taken place prior to the May 9, 1983, closing, and that they were debtors in bankruptcy at the time of the settlement. Further, Manning claims that any damages suffered by Family Federal, Frankie Davis, and National Mortgage resulted from William and Patrice Davis's negligence, and seeks contribution or indemnification from William and Patrice Davis for any sums adjudged against him.

■ On December 16, 1987, the court issued an order to show cause why Manning's cross-claim against the Davises, which the court found to be based on essentially the same allegations as his cross-claim against First American, should not be dismissed for the same reasons the court dismissed the cross-claim against First American. As to First American, the court found there was no causal connection between First American's failure to advise Manning of the Davises'

bankruptcy and the loss resulting from the bounced check. The court found that had Manning been informed of the bankruptcy, he would have been on inquiry notice and inquiry would have revealed that (i) the bankruptcy court had issued an order that specifically authorized the transaction and (ii) that all the principals to the transaction, including the new lender, knew of the bankruptcy and were prepared to proceed notwithstanding the bankruptcy.

Manning responded to the order to show cause by arguing that had he known a foreclosure sale had taken place, he would not have conducted the settlement; and, had National Mortgage been informed of the foreclosure sale, it would not have allowed the settlement. The evidence does not support Manning's argument. Ralph Reinecke, the officer of National Mortgage involved in loaning the money to Frankie Davis, testified that he knew of the foreclosure prior to the settlement. Further, the court does not believe that Manning would not have gone forward with the settlement had he been aware of the foreclosure. Knowledge of the foreclosure would have led Manning to the Consent Order, and knowledge that Family Federal had agreed not to record the foreclosure deed. As was the case with First American, the court fails to find any causal connection between the Davises' failure to inform Manning of the foreclosure and their bankruptcy, and the losses resulting from the bounced check. Manning's claim against William and Patrice Davis will therefore be dismissed.

## VII. *NATIONAL MORTGAGE'S CROSS-CLAIMS*

National Mortgage asserts a cross-claim for indemnity and/or contribution against Manning, Radford Financial, Rae and Blair on the grounds that any damages suffered by Family Federal are the direct result of the negligence and breach of fiduciary duty by Manning and/or the conversion and/or embezzlement of the loan proceeds by Radford, Rae and Blair.[19] Radford and Rae did not defend against these counterclaims, and the

court finds that judgment against Radford and Rae would be appropriate if any judgment were to be against National Mortgage. Moreover, the facts justify indemnification from Manning for any judgment recovered against National Mortgage. However, as no judgment is being entered against National Mortgage, no judgment for indemnification will be given.

## VIII. BAY STATE'S CLAIMS

### A. *Counterclaim against Family Federal*

■ Bay State filed a counterclaim against Family Federal on the grounds that it had a duty to record its foreclosure deed within thirty days of the foreclosure, in accordance with the Consent Order, in order to prevent injury to others who might purchase a note to refinance the property. Bay State claims that Family Federal deliberately failed to record its deed in order to mislead other lenders into believing that William and Patrice Davis still maintained title and to induce a "bail-out" of plaintiff from property it did not wish to own. Bay State claims that had it known that Family Federal possessed an unrecorded foreclosure deed, it would not have purchased Frankie Davis's note from National Mortgage.

In purchasing the promissory note from Frankie Davis to National Mortgage, Bay State had no notice of the foreclosure deed and expected that the promissory note would be secured only by a first deed of trust in favor of National Mortgage. The court finds that Bay State would not have purchased the promissory note had it known that Family Federal held an unrecorded foreclosure deed and that Family Federal was providing secondary financing in order to complete the transaction. Thus, Bay State, as well as the other parties to the transaction, changed its position in reliance upon Family Federal's failure to exercise its rights under the Consent Order. Accordingly, Family Federal, by delaying recordation of its deed for an unreasonable time to the detriment of Bay

---

**19.** National Mortgage did not pursue its claim against Blair and, accordingly, the court will dismiss the counterclaim against Blair.

State, is equitably estopped from recording its foreclosure deed.

Rather than asserting an affirmative cause of action against Family Federal, Bay State's cross-claim is more in the nature of a defense to Family Federal's claim that it is entitled to record its foreclosure deed. The court rules in favor of Bay State, and Family Federal's claim will be denied. Moreover, as set forth above, that deed will be declared invalid, void and cancelled.

### B. Cross–Claim Against National Mortgage

Bay State filed a cross-claim against National Mortgage on the grounds of fraudulent misrepresentation or, in the alternative, negligent misrepresentation. The court finds that National Mortgage represented to Bay State that it held a first trust against the property and that there was no secondary financing. Bay State would not have purchased the note had it known these representations to be untrue. As an innocent party to the transaction, Bay State should be put into the position for which it bargained, that being the holder of a promissory note secured by a first deed of trust against property owned by Frankie Davis. However, in light of the disposition of the case with regard to Family Federal's lien, no relief against National Mortgage is warranted.

### CONCLUSION

In sorting out the rights and liabilities of the various parties in this action, the court has been guided by the equitable principle that where the prejudicial situation has resulted from the wrongful act of a third person, the decision must be against the party whose conduct made possible the wrongdoer's act, breach of trust, fraud, or negligence. Here, the wrongful act was that of Rae and Radford Financial in converting $45,641.70 in loan proceeds for their own use. There can be no question that Rae and Radford are liable to each of the parties for the losses they suffered. However, the court takes judicial notice that Rae has been

through a Chapter 7 bankruptcy and, accordingly, recovery from Rae by any of the parties is questionable.

Manning and Family Federal are each liable for their negligence in making Rae's conversion of the funds possible. However, the parties are not equally culpable. The more culpable is Manning, who acted as the settlement agent and therefore had a fiduciary responsibility to each of the parties to the transaction. He breached that duty by turning the loan proceeds over to Radford Financial and failing to see that they were properly disbursed. However, given Manning's breach, Family Federal was still in a position to have averted the loss. Knowing Rae's reputation, Family Federal cannot be excused for failing to follow its own procedures and for accepting and holding a check drawn on a general account for an unreasonable period of time under the circumstances.

Accordingly, the court concludes that Family Federal may seek its recovery from Rae and Radford for the conversion of the check and, as Manning and Family Financial are concurrent tort feasors, Family Financial is entitled to contribution from Manning in the amount of one-half of the loss resulting from Rae's conversion of the loan proceeds. Further, the parties should as much as possible be placed in the position for which they bargained. National Mortgage advanced funds in the expectation of holding a first deed of trust against the property, and Bay State purchased the note in reliance upon National Mortgage's representation that the note was indeed secured by a first deed of trust. That is the position in which they should be left.

As to Family Federal, it made a usurious loan in 1981. Accordingly, it is not entitled to any interest on that loan, only principal, and it collected more than the principal on that loan. As Family Federal collected more than its due, it must return the excess to the Frankie Davis.[20] And as no balance is due on the 1981 Note, the deed of trust securing it must be released and Family Federal's foreclosure deed invalidated.

---

**20.** The 1981 note was owed by William and Patrice Davis, not Frankie Davis, but the overpayment was made with the proceeds of Frankie Davis's loan from National Mortgage. Accordingly, the excess payment should be returned to Frankie Davis, not to William and Patrice Davis.

The Second Trust Note was given to cover the deficiency on the 1981 Note and the finder's fee charged by Radford Financial. However, there was no deficiency on the 1981 Note and Radford Financial is not entitled to the finder's fee. Accordingly, the Second Trust Note is invalid and must be cancelled, along with the deed of trust securing it.

To the extent Family Federal collected any amounts on the Second Trust Note that it did not pay to Radford Financial, Family Federal must credit that amount against the 1981 loan balance in calculating the excess to returned to Frankie Davis. Moreover, from the date the excess accrued, prejudgment interest should be included in the refund, at the rate charged on the National Mortgage loan. Additionally, Frankie Davis is entitled to recover from Family Federal a statutory fine in the amount of $1,000.00 and the amount of the attorney fees she incurred in prosecuting her claim of federal Truth-in-Lending Act claim against Family Federal.

Further, the court finds that Manning showed a reckless and willful disregard for the rights of Frankie Davis in failing to fulfill his responsibilities as settlement attorney. Accordingly, the court holds that Manning is liable to Frankie Davis for the remaining amount of her attorneys fees and costs as punitive damages.